**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PLAINTIFF UNDER SEAL<br><br>v.<br><br>DEFENDANTS UNDER SEAL | Civil Action No.: 1:13-cv-01880<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 *ET SEQ.***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>AMELIORATE PARTNERS, LLP<br>1201 Orange Street #600<br>Wilmington, Delaware 19899<br><br>*Plaintiffs,*<br><br>v.<br><br>ADS TACTICAL, INC.<br>621 Lynnhaven Parkway, Suite 400<br>Virginia Beach, VA 23452<br><br>ADS, INC.<br>621 Lynnhaven Parkway, Suite 400<br>Virginia Beach, VA 23452<br><br>ADS INTERNATIONAL, LLC<br>477 Viking Dr., Suite 350<br>Virginia Beach, VA 23452<br><br>MAR-VEL INTERNATIONAL, INC.<br>7115 Airport Highway<br>Merchantville, NJ 08109<br><br>MJL ENTERPRISES, LLC<br>2748 Sonic Drive<br>Virginia Beach, VA 23453<br><br>SEK SOLUTIONS, LLC<br>629 Phoenix Drive, Suite 115A<br>Virginia Beach, VA 23452<br><br>MYTHICS, INC.<br>1439 N. Great Neck Road, Suite 201<br>Virginia Beach, VA 23454<br><br>EMERGENT, LLC<br>8219 Leesburg Pike Suite 300<br>Vienna, VA 22182 | Civil Action No.: 1:13-cv-01880<br><br>**SECOND AMENDED COMPLAINT FOR<br>FALSE CLAIMS ACT VIOLATIONS<br>UNDER 31 U.S.C. § 3729 *ET SEQ.***<br><br>**FILED BY HAND** |

IRON BRICK ASSOCIATES, LLC
1439 N. Great Neck Road
Virginia Beach, VA 23454

AGILEX TECHNOLOGIES, LLC
5155 Parkstone Drive
Chantilly, VA 20151

LUKE M. HILLIER
5000 Ocean Front Avenue
Virginia Beach, VA 23451

R. SCOTT LAROSE
5850 Post Corners Trail, Apt J
Centreville, VA 20120

DANIEL J. CLARKSON
2205 Windward Shore Drive
Virginia Beach, VA 23451

MICHAEL A. HILLIER, JR.
4200 Sandy Bay Drive
Virginia Beach, VA 23455

CHARLES M. SALLE
1268 Alanton Drive
Virginia Beach, VA 23454

JOHN DOES NOS., 1-50, FICTITIOUS
NAMES,

*Defendants*.

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................... 4

III. PARTIES ........................................................................................................................ 4

    A.   Plaintiff/Relator ................................................................................................. 4

    B.   Defendants ......................................................................................................... 5

        1.   Defendant ADS, Inc./Defendant ADS Tactical, Inc. ........................ 5

            i.   Defendant ADS International, LLC ..................................... 6

            ii.   Defendant Mar-Vel International, Inc. ................................. 6

            iii.   Defendant MJL Enterprises, LLC ....................................... 6

            iv.   Defendant SEK Solutions, LLC .......................................... 6

        2.   Defendant Mythics, Inc. ................................................................... 7

            i.   Defendant Emergent, LLC .................................................. 7

            ii.   Defendant Iron Brick Associates, LLC ............................... 7

        3.   Defendant Agilex Technologies, LLC ............................................. 7

        4.   Defendant Luke M. Hillier ............................................................... 7

        5.   Defendant Michael A. Hillier, Jr. .................................................... 7

        6.   Defendant R. Scott LaRose ............................................................. 8

        7.   Defendant Daniel J. Clarkson .......................................................... 8

        8.   Defendant Charles M. Salle .............................................................. 8

        9.   John Does Nos. 1-50, Fictitious Names ........................................... 8

IV.  BACKGROUND ............................................................................................................ 9

    A.   Federal Small Business Contracting ................................................................ 9

    B.   Liability Under the Non-Manufacturer Rule .................................................. 13

C.   The Service-Disabled Veteran-Owned Small Business ("SDVOSB")
      Procurement Program .................................................................................14

D.   Women-Owned Small Businesses ("WOSBs") or Economically
      Disadvantaged Women-Owned Small Businesses ("EDWOSBs")
      Procurement Program .................................................................................16

E.   The Ostensible Subcontractor Rule ...........................................................18

F.   The "Presumed Loss Rule" Under the Small Business Jobs Act of 2010 ..................21

G.   Violations of the United States Government Conflicts of Interest Laws and
      Bribery of Government Employees ............................................................23

H.   Liability And Remedies Under the False Claims Act ...............................25

V.   THE ADS AFFILIATED DEFENDANTS' FRAUDULENT SCHEME .............................27

A.   The Defendants Are Affiliated for Purposes of the SBA Laws and
      Regulations .................................................................................................27

     1.   ADS Tactical, Inc./ADS, Inc. ............................................................27

          i.    Defendant ADS International, LLC ...............................................35

          ii.   Defendant Mar-Vel International, Inc. ..........................................36

          iii.  Defendant MJL Enterprises, LLC ...................................................39

          iv.   Defendant SEK Solutions, LLC ......................................................43

     2.   Defendant Mythics, Inc. ....................................................................46

          i.    Defendant Emergent, LLC .............................................................51

          ii.   Defendant IronBrick Ltd./Iron Brick Associates, LLC ......................56

     3.   Defendant Agilex Technologies, LLC ...............................................59

     4.   Defendant Luke M. Hillier ................................................................62

     5.   Defendant Michael A. Hillier, Jr. ......................................................63

     6.   Defendant R. Scott LaRose ................................................................64

     7.   Defendant Daniel J. Clarkson ............................................................65

     8.   Defendant Charles M. Salle ...............................................................66

B.    The ADS Affiliated Defendants Intentionally Misrepresented Their Size
       Status .................................................................................................................67

VI.    THE ADS AFFILIATED DEFENDANTS SUBMITTED FALSE CLAIMS
        THROUGH THEIR VIOLATION OF THE NON-MANUFACTURER RULE .............70

VII.   THE ADS AFFILIATED DEFENDANTS CONSPIRED WITH OTHER
        AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES ..............................72

VIII.  ADS' PAYMENTS OF BRIBES TO A GOVERNMENT CONTRACTING
        OFFICER TO SECURE A FEDERAL PRIME VENDOR CONTRACT
        CAUSED THE SUBMISSION OF FALSE CLAIMS......................................................84

IX.    ADS USED INSIDE INFORMATION FROM GOVERNMENT CONTRACTING
        OFFICIALS TO ENSURE WINNING BIDS UNDER THE PRIME VENDOR
        CONTRACT...................................................................................................................87

X.     ADS ENGAGED IN ILLEGAL BID RIGGING .................................................................88

XI.    THE ADS AFFILIATED DEFENDANTS' FRAUDULENT SUBMISSION OF
        FALSE CLAIMS TO FEDERAL PROGRAMS................................................................90

XII.   SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS
        MISREPRESENTATION FRAUD..................................................................................94

**COUNT I** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ....................................95

**COUNT II** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))....................................96

**COUNT III** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ..................................96

**COUNT IV** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ..................................97

### SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 *ET SEQ.*

This is an action brought on behalf of the United States of America by Ameliorate Partners, LLP ("Relator"), by and through its attorneys, against Defendants (collectively, "the ADS Affiliated Defendants"), and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA").

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States, arising from false statements and claims that the ADS Affiliated Defendants knowingly presented to, or caused to be presented to, the United States in violation of the FCA.

2.    The ADS Affiliated Defendants knowingly presented and/or have made, or caused to be presented or made, the false self-certifications and statements at issue, in order to win billions of dollars in contracts solicited by various federal agencies that were reserved or set aside for eligible small businesses.  Beginning at least as early as 2007, and likely much earlier, the ADS Affiliated Defendants knowingly submitted, or caused to be submitted, to Government programs numerous false claims for payment arising from the ADS Affiliated Defendants' fraudulent course of conduct.

3.    The ADS Affiliated Defendants made false representations that they were eligible for awards on small business set-aside contracts when they were, in fact, ineligible due to affiliation with a number of commonly controlled companies.  This affiliation made them ineligible for small business set-aside contracts per Small Business Administration ("SBA") rules and regulations.

4.    As a consequence of their willful misrepresentations, the United States awarded small business set-aside contracts to the ADS Affiliated Defendants and paid monies for certain

1

supplies and services from the ADS Affiliated Defendants that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that they did not constitute small business concerns under the applicable rules and regulations.

5.      The practices complained of herein are continuing. As detailed below, the ADS Affiliated Defendants' actions and omissions have caused many years of improper and illegal billings to the United States.   For the years 2007-2013, the ADS Affiliated Defendants' aggregate United States sales from Federal contracts total over $7.3 billion, approximately $2.8 billion of which improperly came from small business set-aside contracts.

6.      On many of the small business set-aside contracts for which the ADS Affiliated Defendants won by misrepresenting their size status, the ADS Affiliated Defendants also violated the SBA's non-manufacturer rule.   With limited exceptions, the SBA's non-manufacturer rule restricts a vendor under a small business set-aside contract from reselling to the government anything but the products of another small business.   From at least 2007 to the present, in explicit violation of the SBA non-manufacturer rule, the ADS Affiliated Defendants have supplied at least $300,000,000 worth of products manufactured by *large businesses* and/or products manufactured or produced outside the United States or its outlying areas.

7.      Moreover, on or about 2008, in violation of the Procurement Integrity Act, the Federal Acquisition Regulations ("FAR"), and Federal bribery law, the ADS Affiliated Defendants paid bribes to Cynthia Skrocki, a Contracting Officer at the Defense Logistics Agency's Defense Supply Center Philadelphia ("DSCP"), in order to influence the awarding of certain contracts, including a $487,799,322 firm fixed price contract and subsequent quotes under the Special Operational Equipment Tailored Logistics Support Program (the "TLS Program").   As a result of the ADS Affiliated Defendants' false and/or fraudulent representations

2

and conduct, and the Government's reliance thereon, the Government was falsely and/or fraudulently induced to enter into certain contracts, including the TLS Program contract, with the ADS Affiliated Defendants and accepted terms and conditions to which it would not have agreed had it known the truth. Because the United States was falsely and/or fraudulently induced to enter into such contracts, including the TLS Program contract, with the ADS Affiliated Defendants, each claim for payment under these tainted contracts was a false claim.

8.     Among other misconduct, as detailed herein, the ADS Affiliated Defendants conspired with numerous co-conspirators to deceive the Government as to their small business status. This misconduct was based on collusion and conspiracy among the ADS Affiliated Defendants and these co-conspirators to conceal their size status from the Government.

9.     As a direct, proximate and foreseeable result of the ADS Affiliated Defendants' fraudulent course of conduct set forth herein and conducted on a national scale, from at least 2007 through at least April 2014, the ADS Affiliated Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of thousands of false or fraudulent statements and false claims to Government programs for payment for their products. As a result of these false certifications, the Government was falsely and/or fraudulently induced to enter into numerous contracts with the ADS Affiliated Defendants and accepted terms and conditions to which it would not have agreed had it known the truth. Because the United States was falsely and/or fraudulently induced to enter into these contracts with the ADS Affiliated Defendants, each claim for payment under the contracts was a false claim.

10.     In addition, ADS has been involved in illegal bid rigging related to government contract opportunities that fraudulently induced the Government to enter into numerous contracts

with the ADS Affiliated Defendants and accepted terms and conditions to which it would not have agreed had the Government known the truth.

11.    This conduct is continuing.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

13.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

14.    Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendants own and operate businesses within this judicial district, and certain acts that form the basis of this Second Amended Complaint occurred in this judicial district.

15.    The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.    PLAINTIFF/RELATOR

16.    Relator Ameliorate Partners, LLP ("Relator"), a Delaware general partnership, brings this action on behalf of itself and the United States of America.  The registered office of the Partnership is 1201 Orange Street #600, Wilmington, Delaware 19899, and the name of the registered agent at such address is Incorp Services, Inc.

17.     Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Ameliorate Partners, LLP is not distinct from its partners, and at least two of whom has personal knowledge of the false claims, statements, and concealments alleged herein.

18.     Relator is an original source of the allegations in this Second Amended Complaint against Defendants, and the allegations are not based upon publicly disclosed information.  It has provided the Government with information prior to the filing of the Complaint in accordance with 31 U.S.C. § 3730(b)(2).

19.     One of the Ameliorate partners works as a government contract consultant.   The other Ameliorate partner was employed at Defendant ADS, Inc.

20.     Ameliorate has direct knowledge of the conduct alleged in this Second Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States.  Accordingly, Ameliorate is an "original source" of the non-public information alleged in this Second Amended Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

21.     Ameliorate also voluntarily provided the non-public information alleged herein to the Government prior to filing this action in accordance with 31 U.S.C. § 3730(b)(2).

**B.     DEFENDANTS**

1.     **Defendant ADS, Inc./Defendant ADS Tactical, Inc.**

22.     ADS, Inc. ("ADS," also known as "Atlantic Diving Supply") is a Virginia corporation with its principal place of business at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia 23452.   ADS was incorporated in 1997 and commenced operations on September 18, 1997.  Until on or about 2010, ADS' principal place of business was 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452.

23.     On October 2, 2009, Tactical Holdcorp, Inc., a Virginia corporation having no separate operations, acquired all the stock of ADS, at which time ADS became a wholly owned subsidiary of Tactical Holdcorp, Inc.  In June 2010, Tactical Holdcorp, Inc. changed its name to ADS Tactical, Inc., a Delaware corporation with its principal place of business at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia 23452.

### i.     Defendant ADS International, LLC

24.     Defendant ADS International, Inc. ("ADS International") was until its dissolution in 2008 a Virginia corporation with its principal place of business at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452, which was the former principal place of business of ADS.  ADS International was a wholly owned subsidiary of ADS, Inc.

### ii.     Defendant Mar-Vel International, Inc.

25.     Mar-Vel International, Inc. ("Mar-Vel") is a New Jersey corporation with its principal place of business at 7115 Airport Highway, Merchantville, New Jersey 08109.  Mar-Vel is a wholly owned subsidiary of ADS.

### iii.     Defendant MJL Enterprises, LLC

26.     MJL Enterprises, LLC ("MJL") is a Virginia corporation with its principal place of business at 2748 Sonic Drive, Virginia Beach, Virginia 23453. MJL's previous place of business was 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452, which was ADS' former principal place of business.

### iv.     Defendant SEK Solutions, LLC

27.     SEK Solutions, LLC ("SEK") is a Virginia limited liability company with its principal place of business at 629 Phoenix Drive, Suite 115A, Virginia Beach, Virginia 23452. SEK has also had offices at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452, which was ADS' former principal place of business.

### 2.      Defendant Mythics, Inc.

28.     Mythics, Inc. ("Mythics") is a Virginia corporation with its principal place of business at 1439 N. Great Neck Road, Suite 201, Virginia Beach, Virginia 23454.

#### i.      Defendant Emergent, LLC

29.     Emergent LLC ("Emergent") is a Virginia limited liability company with its principal place of business at 8219 Leesburg Pike, Suite 300, Vienna, Virginia 22182.  It was formed in 2006.  Emergent's previous place of business was 1439 N. Great Neck Road, Virginia Beach, Virginia 23454, which is the same principal place of business as Defendant Mythics, Inc. Emergent is a subsidiary of Mythics.

#### ii.      Defendant Iron Brick Associates, LLC

30.     Defendant Iron Brick Associates, LLC ("Iron Brick") is a Virginia limited liability company with its principal place of business at 1439 N. Great Neck Road, Virginia Beach, Virginia 23454, which is the same principal place of business as Mythics, Inc.

### 3.      Defendant Agilex Technologies, LLC

31.     Defendant Agilex Technologies, Inc. ("Agilex") is a Florida corporation with its principal place of business at 5155 Parkstone Drive, Chantilly, Virginia 20151.

### 4.      Defendant Luke M. Hillier

32.     Luke M. Hillier is a resident of Virginia. His current address is 5000 Ocean Front Avenue, Virginia Beach, Virginia 23451.

### 5.      Defendant Michael A. Hillier, Jr.

33.     Michael A. Hillier, Jr. is a resident of Virginia.  His current address is 4200 Sandy Bay Drive, Virginia Beach, Virginia 23455.

### 6.     Defendant R. Scott LaRose

R. Scott LaRose is a resident of Virginia. His current address is 5850 Post Corners Trail, Apt J, Centreville, Virginia 20120.

### 7.     Defendant Daniel J. Clarkson

34.     Daniel J. Clarkson is a resident of Virginia.  His current address is 2205 Windward Shore Drive, Virginia Beach, Virginia 23451.

### 8.     Defendant Charles M. Salle

35.     Defendant Charles M. Salle is a resident of Virginia.  His current address is 1268 Alanton Drive, Virginia Beach, Virginia 23454.

### 9.     John Does Nos. 1-50, Fictitious Names

36.     John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with the ADS Affiliated Defendants to perpetuate the scheme described herein.

37.     To the extent that any of the conduct or activities described in this Second Amended Complaint was not performed by the ADS Affiliated Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the ADS Affiliated Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with the ADS Affiliated Defendants to perpetrate the scheme described herein.

38.     As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States has suffered financial harm.

## IV.   BACKGROUND

### A.   FEDERAL SMALL BUSINESS CONTRACTING

39.   Encouraging small business participation in federal contracting is not a new initiative.  Congress passed the Small Business Act in 1953 to declare government's commitment to the success of small businesses and to ensure that a "fair proportion" of government contracts go to small business entities.  15 U.S.C. § 631(a).  That commitment was re-affirmed in the Small Business Jobs Act of 2010.  Pub. L. No. 111-240 (2010).

40.   In the Small Business Act, Congress created a government-wide goal for contracting to small businesses, which is currently 23 percent of all federal procurements.  15 U.S.C. § 644 (g).

41.   Each year, the Small Business Administration reports on each of the federal agencies' progress in reaching its goal of contracting with small businesses. Small Business Contracts: Examining How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small Business Contracts Before the Subcomm. on Contracting Oversight Senate Homeland Security and Governmental Affairs Committee, 112th Cong. (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration).

42.   In order to meet the small business contracting goals, each federal agency involved in procurement creates opportunities called "set-asides" for either all small businesses or a subset of small businesses to compete against a pool of like-size contractors.  Devon E. Hewitt, Jonathan T. Williams & Isaias Alba, IV. *Small Business Contracting Programs – Part I.* Briefing Papers No. 10-11, Oct. 2010, at 3.  This allows small businesses to gain opportunities they might not have had competing against larger, resource-rich companies.

43.     There are a number of small businesses that qualify for additional special programs by virtue of their company's minority ownership and/or geographic location.  Each of these categories, such as small disadvantaged business or 8(a) contractors, has its own qualifications for certification by the Small Business Administration ("SBA") or self-certification and allows for additional opportunities to compete against similarly qualified small businesses (i.e., only those in their category).

44.     Qualifying for a small business contracting program allows businesses to more readily gain lucrative opportunities with the Federal Government.  In 2009, approximately $100 billion went to small businesses to procure goods and services.  Reginald M. Jones & Douglas P. Hibshman.  *Limitations on Teaming Arrangements in Small Business Set-Asides.*  Procurement Lawyer, at 1, Spring 2010.

45.     Given the potential of receiving a contract set aside only for small businesses, and the amount of money available, it is not surprising that businesses explore all the possible avenues to qualify.

46.     However, misrepresenting a firm as "small" in order to obtain set-aside contracts is strictly prohibited.  15 U.S.C. § 645.  The Small Business Act provides sanctions for false certifications up to $500,000 and imprisonment.  Any violation of the rules governing eligibility may result in a firm misrepresenting itself as a small business.

47.     The SBA defines small businesses as those "not dominant in [their] field," but the actual size standard varies by industry and the industry code described in the North American Industry Classification System ("NAICS").  SMALL BUS. ADMIN., WHAT ARE THE SMALL BUSINESS SIZE STANDARDS?, *available at* http://www.sba.gov/content/what-are-small-business-size-standards (last visited May 23, 2014).  The SBA uses NAICS as a basis for its size

standards, which are typically the average number of persons employed for each pay period over the latest twelve months, or the average annual receipts over a three-year period. *Id*. Those standards set the threshold to qualify as a small business for Federal procurement opportunities. *Id*.

48.     Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register. 13 C.F.R. § 121.101.  For example, a dive equipment supply company is classified under NAICS code 451110.  The corresponding size standard for that NAICS code is $14 million in average annual receipts over the most recent three-year period.  If the dive equipment supply company and its affiliates have average annual receipts in excess of $14 million, it is not a small business for that NAICS code and may not bid on a set-aside contract with that NAICS code.

49.     Eligibility for small business set-aside opportunities is generally determined on a procurement by procurement basis.  Each procurement officer must classify the product or service being sought in a particular NAICS code, identify the size standard SBA has set for that code and specify the standard in the solicitation, so businesses can correctly determine if they qualify as small for that particular solicitation.  FAR § 19.102.

50.     In determining the size of a business, the SBA rules count the number of employees or the contractor's three-year annual revenues, as well as those of any affiliates of the contractor. C.F.R. § 121.103(a)(6).

51.     Affiliation is determined when one business has the power to control another or a third entity has the power to control both, whether exercised or not.  *Id*. § 121.103(a)(1). The SBA uses a totality of the circumstances test and may find affiliation even when no single factor is sufficient. *Id*. § 121.103(a)(5).  The SBA publishes clear guidance illustrating the operation of

the affiliation rules.   SMALL BUS. ADMIN., AN OVERVIEW ON AFFILIATION, *available at* http://www.sba.gov/sites/default/files/affiliation_discussion_0.pdf (last visited May 23, 2014).

52.   The SBA considers factors to determine affiliation including common ownership and management, previous relationships with or ties to another concern, substantially identical business interests, or contractual arrangements.   13 C.F.R. § 121.103(a)(2).

53.   Affiliation through common ownership and management can be found when a person or entity is a majority shareholder of a small business concern or where the officers, directors or managing members of one concern are able to control the board of directors and/or management of another concern. *Id*. § 121.103(e).   The positions of CEO, COO, and CFO are commonly understood to be senior leadership positions that carry with them the ability to exercise substantive control or critical influence over the company's operations.

54.   Affiliation through identical business interests can be found either when two or more entities have substantially identical business or economic interests (either because of family ties, common investments or firms economically dependent on each other), or when former owners, managers, or key employees of one concern organize a new concern in the same or related field. *Id*. § 121.103(f).

55.   Ascertaining an entity's size to determine eligibility to bid is not a difficult exercise.   The SBA has extensive, layman readable instructions that describes the process in plain English. *See, e.g*., SMALL BUS. ADMIN., SMALL BUSINESS SIZE STANDARDS, *available at* http://www.sba.gov/category/navigation-structure/contracting/contracting-officials/eligibility-size-standards (last visited May 23, 2014).   Through one of their lawyer executives, the ADS Affiliated Defendants could have easily consulted these resources and received confirmation that they were ineligible to bid on the set-aside contracts due to their affiliation.

56.     If consulting the SBA web site was too difficult, the ADS Affiliated Defendants could have, free of charge, placed a phone call to one of the many SBA Procurement Centers around the country.  These centers are staffed with experienced personnel trained to provide guidance on size and status compliance questions.  The directory is found at: http://www.sba.gov/content/procurement-center-representatives.

57.     In fact, an SBA Procurement Center is sited in close proximity to the ADS Affiliated Defendants' places of business in nearby Hampton Roads:

> Octavia Turner (PCR)
> SBA Representative
> Virginia Government Contracting Office
> Government Contracting Area II
> Procurement Center Representative
> NASA Langley Research Center
> Bldg. 1195B, Rm. 230, MS 144
> Hampton, Virginia  23681-2199

## B.     LIABILITY UNDER THE NON-MANUFACTURER RULE

58.     The non-manufacturer rule is an exception to the usual requirement under the Small Business Act that contractors supplying goods to the Government may not expend on subcontractors more than 50 percent of the amount paid to the prime under the contract.  Simply put, under small business set-aside contracts, the non-manufacturer rule allows a small business to supply products it did not manufacture, as long as the products are manufactured by another *small business* and the product furnished is manufactured or produced in the United States or its outlying areas.

59.     The regulations that govern the non-manufacturer rule are contained in Part 19 of the Federal Acquisition Regulation and Part 13 of the Code of Federal Regulations.  The Rule allows a firm to qualify as a "non-manufacturer" if it will supply the end item of a small business

manufacturer, processor or producer in the United States, unless an individual or class waiver of that requirement is obtained. 13 C.F.R. § 121.406(b)(1).

60.     Importantly, the size standard threshold for a small business whose products are supplied by the non-manufacturer is not based on a dollar amount, but instead on the number of employees.  In any case, the manufacturer whose products are supplied by the non-manufacturer under an SBA set-aside contract cannot exceed 500 employees.

### C.   THE SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS ("SDVOSB") PROCUREMENT PROGRAM

61.     The Service-Disabled Veteran-Owned Small Business ("SDVOSB") procurement program is an extension of the Federal Government's policy to maximize procurement opportunities for small businesses.  It also is intended to honor the extraordinary service rendered to the United States by veterans with disabilities incurred or aggravated in the line of duty during active service with the armed forces. The Veterans Benefits Act of 2003, Pub. L. No. 108-183, § 308, 117 Stat, 2651, 2662 (2003), which established the program, permits contracting officers to award set-aside and sole-source contracts to any small business concern owned and controlled by one or more service-disabled veterans.  Executive Order 13360 also requires federal procurement officials and prime contractors to provide opportunities for these firms to increase their federal contracting and subcontracting. The statutorily-mandated prime and subcontracting goal for SDVOSB participation is not less than 3 percent of all federal contract dollars.   Veteran Entrepreneurship Act of 1999, Pub. L. No. 106-50, § 502, 113 Stat. 233, 247 (1999).

62.     In order to be eligible for a set-aside or sole-source SDVOSB contract, a firm must meet certain criteria.  In accordance with Part 125, Title 13, Code of Federal Regulations, an SDVOSB concern must be at least 51-percent unconditionally and directly owned by one or more service-disabled veterans. 13 C.F.R. § 125.9.   In addition, the management and daily

14

business operations of the concern must be controlled by one or more service-disabled veterans. *Id*. § 125.10.   This requires that both the long-term decision-making and the day-to-day management and administration of the business operations be conducted by one or more service-disabled veterans.   A service-disabled veteran must hold the highest officer position in the concern (usually president or chief executive officer) and must have managerial experience to the extent and complexity needed to run the concern.   In the case of a partnership, one or more service-disabled veterans must serve as general partners, with control over all partnership decisions.   Limited liability companies must include one or more service-disabled veterans as managing members, with control over all decisions of the limited liability company.

63.     An SDVOSB may enter into a joint venture agreement with one or more other small businesses for the purpose of performing an SDVOSB contract. 13 C.F.R. § 125.15.   The joint venture must consist of at least one SDVOSB and one or more other small businesses. To qualify as an eligible SDVOSB joint venture, an SDVOSB must serve as the managing venture, and an employee of the managing venture must serve as the project manager.   In addition, at least 51 percent of the net profits earned by the joint venture must be distributed to the SDVOSB concern. The managing venture must also retain the final records upon completion of the contract.

64.     At the time an SDVOSB submits its set-aside offer, it must represent to the contracting officer that it is, in fact, an SDVOSB.   *See* FAR § 19.1403 ("Status as a Service-Disabled Veteran-Owned Small Business Concern").   The contracting officers should use the System for Award Management ("SAM") database as their primary source of vendor information to identify the status of an SDVOSB.   *See* FAR § 13.102 ("Source List").   The status information

may also be used as the basis for ensuring that small businesses receive the maximum practicable opportunities to respond to solicitations.

65.     Contractors must also complete annual electronic representations and self-certifications in SAM in conjunction with required registration.   Contractors are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure that they are kept current, accurate, and complete.   The representations and self-certifications are effective for one year from the date of submission or update to SAM.   In provision 52.212-3, "Offeror Representations and Certifications–Commercial Items," contractors represent whether they meet the status requirements for various small business categories, including SDVOSBs.

66.     The term "veteran" means a person who served in the active military, naval, or air service, and who was discharged or released under conditions other than dishonorable. Service-disabled means that the disability occurred or became aggravated during the line of duty in the active military, naval, or air service. A firm also must qualify as a small business under the NAICS industry-size standards.

**D.      WOMEN-OWNED SMALL BUSINESSES ("WOSBS") OR ECONOMICALLY DISADVANTAGED WOMEN-OWNED SMALL BUSINESSES ("EDWOSBS") PROCUREMENT PROGRAM**

67.     On December 21, 2000, Congress enacted the Small Business Reauthorization Act of 2000, Public Law 106-554.  Section 811 of that Act added a new section 8(m), 15 U.S.C. 637(m), authorizing Federal contracting officers to restrict competition to eligible Women-Owned Small Businesses ("WOSBs") or Economically Disadvantaged Women-Owned Small Business ("EDWOSBs") for Federal contracts in certain industries.   The purpose of this authority, referred to as the WOSB Program, is to enable contracting officers to identify and

16

establish a sheltered market for competition among WOSBs or EDWOSBs for the provision of

goods and services to the Federal Government. H.R. Rep. No. 106-879, at 2 (2000).

      68.    Section 8(m) of the Small Business Act ("Act") sets forth certain criteria for the

WOSB Program. Specifically, the Act provides the following requirements in order for a

contracting officer to restrict competition for EDWOSBs or WOSBs under this program:

- An eligible concern must be not less than 51 percent owned by one or more women who are "economically disadvantaged" (*i.e.* an EDWOSB). However, SBA may waive this requirement of economic disadvantage for procurements in industries in which WOSBs are "substantially underrepresented."

- A WOSB is a small business concern owned and controlled by women, as defined in section 3(n) of the Act. Section 3(n) of the Act defines a women owned business as one that is at least 51 percent owned by one or more women and the management and daily business operations of the concern is controlled by one or more women. 15 U.S.C. § 632(n).

- The contracting officer must have a reasonable expectation that, in industries in which WOSBs are underrepresented, two or more EDWOSBs will submit offers for the contract or, in industries where WOSBs are substantially underrepresented, two or more WOSBs will submit offers for the contract.

- The anticipated award price of the contract must not exceed $5 million in the case of manufacturing contracts and $3 million in the case of all other contracts.

- In the estimation of the contracting officer, the contract can be awarded at a fair and reasonable price.

- Each competing concern must be duly certified by a Federal agency, a State government, or a national certifying entity approved by SBA, as an EDWOSB or WOSB, or must certify to the contracting officer and provide adequate documentation that it is an EDWOSB or WOSB. The statute imposes penalties for a concern's misrepresentation of its status.

- The contract must be for the procurement of goods or services with respect to an industry identified by SBA pursuant to a statutorily mandated study as one in which EDWOSBs are underrepresented or substantially underrepresented or WOSBs are substantially underrepresented with respect to Federal procurement contracting.

      69.    In the self-certifications made with proposals, the WOSB must certify that "[t]he

management and daily business operations of the concern are controlled by one or more women."

Control means that both the long-term decision making and the day-to-day management and administration of the business operations are conducted by one or more women."  In addition, the WOSB must self-certify that "[n]o males or other entity exercise actual control or have the power to control the concern."  EDWOSBs must make similar self-certifications.

70.     Under § 127.700 of the WOSB regulations, "persons who persons or concerns that falsely self-certify, provide false information to the Government, or otherwise misrepresent a concern's status as an EDWOSB or WOSB for purposes of receiving Federal contract assistance under this part are subject to (a) Suspension and Debarment pursuant to the procedures set forth in the Federal Acquisition Regulations, 48 C.F.R. § 9.4; (b) Administrative and civil remedies prescribed by the False Claims Act, 31 U.S.C. §§ 3729-3733 and under the Program Fraud Civil Remedies Act, 31 U.S.C. §§  3801-3812; (c) Administrative and criminal remedies as described at Sections 16(a) and (d) of the Small Business Act, 15 U.S.C. § 645(a) and (d), as amended; (d) Criminal penalties under 18 U.S.C. § 1001; and (e) Any other penalties as may be available under law."

## E.     THE OSTENSIBLE SUBCONTRACTOR RULE

71.     It is common for contractors to join together to compete for government contracts under teaming agreements. Teaming arrangements allow companies to compete for government contracts that they might not be able to obtain and perform individually.  A properly structured teaming arrangement allows the participating companies to work together in seeking an award and, under limited circumstances, can shield the teaming partners from being deemed "affiliated" for purposes of size standards.  Improperly structured teaming arrangements, however, can cause the companies to be deemed "affiliated" and lose their ability to compete for the government contract.

72.  Subpart 9.6 of the Federal Acquisition Regulations ("FAR") recognizes that teaming agreements enable offerors to complement each other's capabilities, and to offer better performance, deliveries, and cost structures. Agencies must recognize the integrity and validity of teaming agreements if the agreements are fully revealed in competitive proposals or before the teaming agreement becomes effective.

73.  A properly structured teaming arrangement must vest control and daily management in the proposed prime contractor, and the proposed prime contractor must be solely responsible for performance.  However, the government may find parties of a teaming arrangement to be "affiliated" for purposes of size standards, where the would-be prime contractor is overly reliant on its teaming partners or the tasks and areas of responsibility of the parties are not clearly delineated.

74.  When a size protest has been lodged against a team on affiliation grounds, the SBA decides whether parties to a teaming arrangement are deemed "affiliated."  If the parties are deemed "affiliated," their revenues and personnel will be combined by the SBA in making its decision of whether the affiliated companies are small for purposes of the procurement at hand.

75.  Under the Ostensible Subcontractor Rule, a would-be prime contractor and its subcontractor may be treated as a joint venture, and therefore affiliates, for size determination purposes if the subcontractor has too great of a role under the teaming arrangement. 13 C.F.R. § 121.103(h)(4).  More specifically, "an ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant."  Under the rule, "[a]ll aspects of the relationship are considered, including the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work),

agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation."

76.     The National Defense Authorization Act of 2013 ("NDAA") changed the way that limitations on subcontracting are calculated.  This is applicable to small businesses that hold prime contracts with the U.S. Government and subcontract portions of the work under their contract to large businesses.  The old rule required the prime contractor to perform "at least 50 percent of the cost of contract performance incurred for personnel" on services contracts or "at least 50 percent of the cost of manufacturing the supplies (not including the cost of materials)" on supply contracts.

77.     The new rule for service contracts requires that the prime contractor "may not expend on subcontractors more than 50 percent of the amount paid to the [prime] under the contract."  For supply contracts, the prime "may not expend on subcontractors more than 50 percent of the amount, less the cost of materials, paid to the [prime] under the contract."  This dramatically changes the way the limitation is calculated, and could result in an expansion or contraction of the subcontracting limit depending on the circumstances.  For purposes of calculating whether the prime meets these new requirements, payments to "similarly situated entities" no longer need to be included as part of the amounts expended on subcontractors.

78.     The NDAA also now imposes the greater of $500,000, or the amount expended in violation of the rules as a penalty for violations.

F.    THE "PRESUMED LOSS RULE" UNDER THE SMALL BUSINESS JOBS ACT OF 2010

79.    The Small Business Jobs Act of 2010 codified the calculation of damages for misrepresentation under the FCA, which significantly increases the ante for prosecutions both by the Government and *qui tam* relators.

80.    Section 1341 of the Jobs Act, also called the "Presumed Loss Rule," (Senate Report 111-343, Small Business Contracting Revitalization Act of 2010, *available at* http://www.gpo.gov/fdsys/pkg/CRPT-111srpt343/html/CRPT-111srpt343.htm (last visited on May 23, 2014), provides a presumption of loss to the Government equal to the total amount expended on the contract.  Small Business Jobs Act of 2010, Pub. L. No. 111-240, §1311-1347 (2010); Albert B. Krachman, *Game Changer: The Presumed Loss Rule and Mis-Certification of Small Business Status*, Contract Management Magazine, May 2011, at 16, *available at* http://www.blankrome.com/siteFiles/Publications/4840855CA653AA3DF85D4F9307A84C4D.p df.  There is no allowance for discounting the damages amount to credit the value of services or goods provided to the Government under the contract.  Small Business Jobs Act of 2010,  Pub. L. No. 111-240, § 1341 (2010).

81.    Through this Act, Congress has clearly stated that the Government's damages calculation shall use an intended beneficiary analysis. S. Rep. No. 111-343 at 8 (2010).  That is, where the Government intended the contract to benefit an eligible small business, and an ineligible business received the benefit of that contract, the entire amount paid to the ineligible contractor becomes the loss to the Government.

82.    This codification is significant because contractors are liable for three times the total amount of money received under the contract plus the penalties and other fees.  31 U.S.C. § 3729.  Thus, an ineligible business that misrepresented its status as small with a $300,000 set-

aside contract may be liable for over $1 million in damages by operation of the Small Business Jobs Act.

83.      The new law also changes the certification process for small businesses.  As part of a bid or proposal, small businesses have historically needed to self-certify that they are an eligible small business.  Under the Small Business Jobs Act, businesses must both initially register as a small business and annually update their status in the SAM database.  These self-certifications are based on the honor system enforced by significant legal exposure if not accurate.

84.      The Small Business Jobs Act also has a Deemed Certification provision, which deems a proposal or bid on a set-aside contact to include a certification that the bidder is an eligible small business for that contract by operation of law.

85.      Both submissions of bids set aside for small businesses and registrations in the SAM database for the purpose of being considered for an award as a small business concern will be deemed "affirmative, willful and intentional certifications of small business size and status." 15 U.S.C. § 632(w)(2).

86.      Each time a large business misrepresents in its self-certifications that it is a "small business" in order to win a contract bid, the large business has won bids that should have been awarded to other small businesses instead.  Likewise, the large business that has misrepresented its size status has gained an unfair advantage on other honest large businesses that have not made such misrepresentations.

87.      The SBA has identified such firms as "bad actors," who are "taking intentional and often fraudulent advantage" of SBA programs.  Small Business Contracts: Examining How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small

Business Contracts Before the Subcomm. on Contracting Oversight Senate Homeland Security and Governmental Affairs Committee, 112th Cong. (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration).  The SBA has made clear that it "has no tolerance for a firm found to be acting fraudulently," adding that, where appropriate, the agency "will act decisively to oust them from our programs and from doing business with the government generally."  *Id*.

88.     Further, the SBA is continuing to take action and make referrals to the Department of Justice "against any firm attempting to 'game the system'" with SBA programs. *Id*.  The SBA has stated that it "will come down hard on those who seek to take unfair advantage of our programs and services to the detriment of the many honest small businesses that depend on those programs and services." *Id*.

G.     **VIOLATIONS OF THE UNITED STATES GOVERNMENT CONFLICTS OF INTEREST LAWS AND BRIBERY OF GOVERNMENT EMPLOYEES**

89.     Section 208 of Title 18 of the United States Code is a federal employee conflict of interest statute designed to protect the integrity of federal agency decision-making by ensuring that federal officials and employees are not tempted by competing loyalties between their federal employment and other actual or potential financial interests.

90.     In addition to criminal penalties, 18 U.S.C. § 216 provides for a civil right of action by the United States against any person or entity that violates 18 U.S.C. § 208 and provides for a civil penalty not to exceed either $50,000 per violation, or the amount of compensation that was provided or offered to the federal employee, whichever is greater.

91.     An official who fails to act as required by the Procurement Integrity Act, 41 U.S.C. § 2103, is also subject to civil and criminal penalties.  Under 41 U.S.C. § 2105, in addition to criminal penalties, individuals who violate the Procurement Integrity Act are subject to civil suits and penalties of not more than $50,000 per violation plus twice the amount of

compensation offered or provided to the individual. Organizations that violate the Procurement Integrity Act by knowingly taking part in prohibited employment discussions are subject to civil penalties of not more than $500,000 per violation plus twice the amount of compensation offered or provided to the individual.

92.     Additionally, a Procurement Integrity Act violation entitles the federal agency to cancel the procurement if an award has not yet been made, to rescind the contract if an award has been made and to recover the entire amount provided to the contractor under the contract, or to suspend or debar the contractor or offeror from federal government business.

93.     The Federal Acquisition Regulation ("FAR"), 48 C.F.R. Part 1, requires, in relevant part, that "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct.  The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." 48 C.F.R. § 3.101-1.

94.     FAR § 3.101-2 states that "[a]s a rule, no Government employee may solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who (a) has or is seeking to obtain Government business with the employee's agency, (b) conducts activities that are regulated by the employee's agency, or (c) has interests that may be substantially affected by the performance or nonperformance of the employee's official duties."

95.     FAR § 9.505 contains requirements regarding organizational conflicts of interest, which are defined generally as situations in which a contractor either: (1) has an unfair competitive advantage in agency contracting; or (2) is placed in a situation that might bias its work for the federal agency.

24

96.     Under Federal bribery law, 18 U.S.C. § 201(b), an executive branch employee may not demand, seek, receive, accept or agree to accept anything of value "in return for being influenced in the performance of any official act." The bribery law is often compared to two other criminal provisions: (1) the illegal gratuities statute, which prohibits an employee from demanding, seeking, receiving, accepting, or agreeing to accept anything of value "for or because of any official act" performed or to be performed by the employee, *see* 18 U.S.C. § 201(c), and (2) the supplementation of salary statute, which prohibits an employee from receiving any salary or supplementation of salary from any person other than the Government as compensation for services as a Government employee, *see* 18 U.S.C. § 209.

## H.     LIABILITY AND REMEDIES UNDER THE FALSE CLAIMS ACT

97.     Each time a business enters into a set-aside contract with the Government and each time it files its annual SAM self-certification, it becomes subject to a stiff sanctions regime intended to deter small business set-aside fraud.

98.     In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d). Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency. 13 C.F.R. § 121.108.

99.     The penalties for violating these self-certifications could not be more clear in the self-certifications made by each business concern bidding under a small business set-aside: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine,

imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act." 15 U.S.C. § 645(d).

100.   The False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat, 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States Government for three times the amount of damages the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Prior to the FERA amendments, the FCA provided that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1).

101.   The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

102.     As amended by FERA, the FCA also makes a person liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).  The FCA, prior to the FERA amendments, provided that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* § 3729(a)(2).

103.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A).  The FCA further provides that "no proof of specific intent to defraud is required." *Id.* § 3729(b)(1)(B).

## V.     THE ADS AFFILIATED DEFENDANTS' FRAUDULENT SCHEME

104.     As alleged in detail below, based on commonality of ownership, common management, identity of interests and other relevant factors, the ADS Affiliated Defendants are affiliated concerns and, when taken together, were at all times material hereto ineligible to bid as small businesses.

### A.     THE DEFENDANTS ARE AFFILIATED FOR PURPOSES OF THE SBA LAWS AND REGULATIONS

#### 1.     ADS Tactical, Inc./ADS, Inc.

105.     Until the sale of the ADS, Inc. stock to Tactical Holdcorp, Inc. in 2010 (now known as "ADS Tactical, Inc."), the ADS stock was owned by Luke M. Hillier (58.42 percent), Daniel J. Clarkson (16.63 percent), and R. Scott LaRose (24.95 percent).  The ownership of ADS

Tactical, Inc. is in the same percentages as the ownership of ADS, Inc.  Pursuant to the Tactical Holdcorp Bylaws adopted on June 25, 2010, "each stockholder of record shall be entitled to one vote for each share of capital stock registered in his name on the books of the Corporation."

106.    ADS was founded by Michael Hillier, Sr. in 1997 as the Government sales division of a Virginia Beach diving supply center, Lynnhaven Dive Center, the Hillier family-owned dive shop that started in 1979.  ADS was spun off as separate company in 1999.  In 2000, Michael's son, Luke (a former Oracle salesman), became Chairman and CEO of ADS.  ADS' growth has been dramatic.  From 2002 to 2005, ADS grew by 6,029 percent, with sales reaching $209.4 million, the majority of it from Government contracts.

107.    ADS' senior management includes Luke M. Hillier (Chief Executive Officer, Chairman of the Board, and Director (Principal Executive Officer)), Daniel J. Clarkson (Chief Operating Officer, Vice Chairman and Director), Charles M. Salle (General Counsel, Vice President), Robert S. LaRose (Director), Karen Rai (Chief Financial Officer), Jason Wallace (President), and Bruce Dressel (Vice President of Product and Equipment Solutions).

108.    From 2009 through 2011, ADS (then a subchapter S corporation) distributed approximately $487 million to its three shareholders, Hillier, LaRose and Clarkson.  Based on their ownership interests in ADS, Hillier, LaRose and Clarkson received $284.47 million, $121.48 million and $80.97 million, respectively.

109.    ADS calls itself a "leading provider of value-added logistics and supply chain solutions specializing in tactical and operational equipment."  Most of ADS' customers are within the Department of Defense and the Department of Homeland Security. The products ADS offers include apparel, expeditionary equipment, optical equipment, communications equipment, emergency medical supplies, lighting, eyewear, and other items.

110.    Since 1997, ADS has widely expanded its product offering and Government procurement vehicles providing on-time, essential operational equipment combined with what it calls "industry-leading logistics solutions to all branches of the U.S. military and Federal Agencies.   From tactical and special operational equipment to fire and emergency services, expeditionary, medical, and MRO equipment, ADS oversees every aspect of the supply chain and ensures availability of superior equipment to our men and women in uniform."

111.    In 2000, ADS, Inc. won the Prime Vendor Contract for Marine Lifesaving, Diving, and Search and Rescue through the Defense Supply Center Philadelphia ("DSCP").   Five years later, ADS won Worldwide Special Operational Equipment Prime Vendor status.   In 2006, ADS was awarded the $220 million prime vendor contract for the Army's Generation III Extended Cold Weather Clothing System ("ECWCS").   In 2008, ADS secured five regional Department of Defense ("DoD") Fire and Emergency Services contracts totaling up to $4 billion to provide equipment and logistical support to federal and local agencies tasked with responding to fires and other emergencies at military installations, federal agencies and at the state and local level.   In 2009, ADS was awarded a contract valued at over $1 billion to deliver the U.S. Army's new Fire Resistant Environmental Ensemble ("FREE").

112.    In 2009, ADS was selected by the DSCP as a primary vendor for the Special Operational Equipment Tailored Logistics Support ("TLS") Program.   Under the TLS Program, which is a set-aside contract for small businesses, ADS supplies Special Operational Equipment to the DoD, military installations and other federal agencies, state and local governments.   The estimated value of the award is $5.7 billion over five years.   The total value of ADS' current Federal contracts exceeds $12 billion.

113.    At all times material hereto, the company has had operations in Virginia Beach, Virginia; San Diego, CA; and Bagram, Kabul, and Kandahar, Afghanistan.

114.    ADS generates substantially all of its sales from contracts with the U.S. Government and its agencies, primarily the agencies and offices within the Department of Defense.  For example, for the year ended December 31, 2010, approximately 97 percent of its net sales were derived directly or indirectly from sales to U.S. Government agencies, including approximately 88 percent to agencies and offices within the Department of Defense.  Between FY2007 and FY2013, ADS has received $5,394,707,222.62 from U.S. Government agencies.  Of this, between FY2007 and FY2013 ADS received $2,681,070,517.25 from the U.S. Government and its agencies under small business set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

115.    Some representative examples of ADS' small business set-aside contracts include:

| Top 25 ADS Inc. Small Business Set-aside contracts, FY 2007-2013 | | | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | DoD | SPM8EJ09D0017 | 2009-2012 | 100 | $778,996,602.59 |
| 2 | DoD | SPM8EJ09D0017 | 2012-2013 | 100 | $656,772,738.56 |
| 3 | DoD | SPM8EJ09D0028 | 2009-2012 | 100 | $613,462,264.08 |
| 4 | DoD | SPM8EJ09D0028 | 2012-2013 | 100 | $332,703,943.74 |
| 5 | DoD | SPM50005DBP18 | 2007-2008 | 100 | $68,896,136.00 |
| 6 | DoD | SPM8EJ09D0020 | 2011 | 500 | $61,448,262.08 |
| 7 | DoD | GS01T12BKD0002 | 2012-2013 | 500 | $18,415,491.81 |
| 8 | DoD | W56HZV10C0459 | 2012-2013 | 500 | $13,347,044.23 |
| 9 | DoD | FA862910A2487 | 2011-2013 | 500 | $9,576,169.74 |
| 10 | DoD | IND11PX18603 | 2011 | 500 | $8,093,939.00 |
| 11 | DoD | GS01T13BKD0005 | 2013 | 500 | $7,379,676.63 |
| 12 | DoD | FA521508A7000 | 2011-2012 | 500 | $6,831,512.14 |
| 13 | DoD | W91CRB10D0044 | 2010-2011 | 500 | $6,491,693.45 |
| 14 | DoD | FA862907A2368 | 2007-2010 | 500 | $4,718,357.58 |
| 15 | DoD | GS01T12BKD0002 | 2013 | 500 | $4,087,783.50 |
| 16 | DoD | H9224009D0024 | 2009-2013 | 100 | $2,962,594.41 |
| 17 | DoD | SPM8EJ09D0020 | 2013 | 500 | $2,297,964.54 |

| 18 | DoD | H9224009D0023 | 2009-2011 | 100 | $2,091,390.25 |
| 19 | DoD | GS09T13BHC0010 | 2013 | 750 | $1,984,806.70 |
| 20 | DoD | W52H0908D0436 | 2009; 2011 | 500 | $1,945,892.97 |
| 21 | DHS | HSBP1011P00769 | 2011 | 500 | $1,574,984.50 |
| 22 | DoD | W15P7T09CD034 | 2009 | 750 | $1,214,097.53 |
| 23 | DoS | SAQMMA13M2352 | 2013 | 500 | $1,159,400.00 |
| 24 | DoD | W52H0908D0436 | 2008 | 500 | $1,152,200.00 |
| 25 | DoD | FA480007P0146 | 2007 | 500 | $1,042,940.00 |

116.    At all times material hereto, ADS has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, ADS has certified that it has at least 425 employees, and other sources reflect that ADS has had over 440 full and part-time employees.  In addition, ADS has self-certified to the Government that its average annual receipts over the past three years have been $968,000,000.

117.    However, a review of the SBA's affiliation factors reveals that ADS is affiliated with a number of other companies, including, but not limited to, Defendants Mythics and Agilex. Taken together, the combined total of ADS Affiliated Defendants is at least 900 employees, thus making ADS ineligible to bid on set-aside contracts for small businesses.

118.    For example, ADS shares common ownership with Mythics. 13 C.F.R. § 121.103(a)(1) (common ownership occurs when one has the power to control the other). Specifically, and as described *supra*, Defendants Luke Hillier, Scott LaRose, Daniel Clarkson, Michael Hillier, Jr., and Charles Salle each hold ownership interests in ADS and Mythics in percentages sufficient to exercise control over each of the other companies.

119.    Further, ADS shares common management with these other companies because Defendants Luke Hillier, LaRose, Clarkson, Hillier, Jr., and Salle have the ability to exercise critical influence or substantive control at ADS, Mythics and Agilex.  13 C.F.R. § 121.103(e) (common management "arises where one or more officers, directors, managing members, or

31

partners who control the board or directors and/or management of one concern also control the board of directors or management of another concern").

120.    For instance, Defendant Luke Hillier, ADS' President and CEO was also the CEO of Mythics from its founding in 2000 through 2009, while also serving as a board member of Defendant Emergent.  Defendant Michael A. Hillier, Jr. currently serves as a member of ADS' Board of Directors, while also serving as Mythics' Chief Operating Officer from 2001 to 2006. Hillier, Jr. is also an Officer and Director of Defendant Iron Brick.  Likewise, while Defendant Charles Salle serves as ADS' General Counsel and a Vice President, he also acted as the Secretary and Director of Mythics from 2007 through 2009.  In addition, from 2011 to 2013, Salle has been a Director at co-conspirator Tactical Yacht, Ltd. along with Luke Hillier and Scott LaRose.

121.    Further, Defendant LaRose became Agilex's Chairman of the Board in 2009.  In addition to his work for Agilex, LaRose has acted as Mythics' Executive Vice President, and since 2004, he has acted as Mythics' President and Director.  In 2010, LaRose assumed the role of Mythics' CEO.  LaRose also co-founded IronBrick, Ltd. and Iron Brick Associates in or about 2006, and continues to serve as a Director for the company.  LaRose is also on the Board of Directors of ADS.

122.    ADS is also affiliated based on its identity of interest with these other companies. 13 C.F.R. § 121.103(f) ("Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated.").

123.    Brothers Luke M. Hillier and Michael A. Hillier, Jr., along with Defendant Scott LaRose, founded Mythics in 1999.  Between 2007 and 2009, Luke M. Hillier, Michael Hillier, Jr. and R. Scott LaRose each owned 33.3 percent of Mythics.  Thereafter, Mythics has been owned by Luke M. Hillier, Michael Hillier, Jr., R. Scott LaRose and Charles M. Salle (ADS' General Counsel), 3.33 percent, 33.33 percent, 13 percent and 50.33 percent, respectively.  Michael A. Hillier, Jr. has served as Mythics' Chief Operating Officer from 2001 to 2006, and currently serves as a member of ADS' Board of Directors.  Meanwhile, Luke Hillier, the CEO of ADS was also the CEO of Mythics from its founding in 2000 through 2009.

124.    There has been, and continues to be, substantial involvement by Luke and Michael Hillier, Jr. in the operations of both ADS and Mythics.  Because of the identity of interests in ADS and Mythics, these companies are affiliated under SBA rules and regulations.

125.    ADS is also affiliated with prime contractors MJL and SEK under the ostensible subcontractor rule based on its performance of primary and vital requirements of MJL (SDVOSB) and SEK (EDWOSB and WOSB) set-aside contracts.  ADS is affiliated with these companies under the ostensible subcontractor rule based on the fact that MJL and SEK, as prime contractors, were at all times material hereto, unusually reliant on ADS.  For example, ADS handled all aspects of MJL and SEK's (i) small business, (ii) SDVOSB, (iii) WOSB and (iv) EDWOSB set-aside proposals to the Government.  ADS also provided nearly all the support for MJL and SEK to perform under these set-aside proposals, including considerable contract management, technical responsibilities, and a majority of the percentage of subcontracted work necessarily to fulfill these contracts.

126.    For these reasons, when the number of employees of the ADS Affiliated Defendants is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding ADS from participating in most set-aside contracts.

127.    Each time ADS entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

128.    ADS' most recent annual self-certification, in which it avers that it is a small business concern, was made on September 13, 2013 by Brad Anderson, ADS' Contracts Director.

129.    These self-certifications were materially false when made.  ADS made false representations that it was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made ADS ineligible to bid as a small business under applicable rules and regulations.  As a consequence of ADS' misrepresentations, the United States awarded contracts to ADS and paid monies for certain supplies and services from ADS that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that ADS did not constitute a small business concern under the applicable rules and regulations.

130.    Because they were induced by its fraudulent size certifications, all the set-aside contracts awarded to ADS were thus void *ab initio.*

131.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of ADS' misrepresentations.

### i.    Defendant ADS International, LLC

132.    By virtue of ADS' controlling ownership and/or management in ADS International, ADS International has at all times material hereto been affiliated with ADS for purposes of its small business status.

133.    From at least FY2007 through FY2010, ADS International received at least twenty-two Government contracts that were set aside for small businesses, including sixteen with the Department of Defense.   Some representative examples of ADS International's small business set-aside contracts include:

| Top 8 ADS International Small Business Set-aside contracts, FY 2007-2010 | | | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | DoD | N0024407P1077 | 2007 | 500 | $184,577.00 |
| 2 | DHS | HSBP1007P19154 | 2007 | $14.00 MM | $113,753.50 |
| 3 | DoD | W91CRB07P0128 | 2007 | 100 | $99,992.00 |
| 4 | DoD | W912CZ07P0302 | 2007 | $14.00 MM | $99,733.00 |
| 5 | DoD | FA940108P0160 | 2008 | 500 | $59,801.00 |
| 6 | DoD | FA302209P0080 | 2009 | 100 | $47,871.82 |
| 7 | DoD | W912CZ07P0223 | 2007 | 750 | $37,800.00 |
| 8 | DoD | W912CZ07P0168 | 2007; 2010 | 500 | $31,482.00 |

134.    Each time ADS International entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies,

including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

135.    These self-certifications were materially false when made.  ADS International made false representations that ADS International was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made ADS International ineligible to bid as a small business under applicable rules and regulations.  As a consequence of ADS International's misrepresentations, the United States awarded contracts to ADS International and paid monies for certain supplies and services from ADS International that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that it did not constitute a small business concern under the applicable rules and regulations.

136.    Because they were induced by its fraudulent size certifications, all the set-aside contracts awarded to ADS International were thus void *ab initio.*

137.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of ADS International's misrepresentations.

### ii.    Defendant Mar-Vel International, Inc.

138.    Since June 7, 2008, Mar-Vel has been a wholly owned subsidiary of Defendant ADS, Inc.  By virtue of ADS having controlling ownership and/or management in Mar-Vel, Mar-Vel has been affiliated with ADS for purposes of its small business status since June 7, 2008.

139.    On June 7, 2008, the ADS purchased 100 percent of the stock of Mar-Vel. The aggregate purchase price was $5,500,000.  According to the ADS S-1 dated February 2, 2011, it purchased Mar-Vel "primarily to obtain available contract capacity under its largest contract." At

the time, the ADS stock was owned by Luke M. Hillier (58.42 percent), Daniel J. Clarkson (16.63 percent), and R. Scott LaRose (24.95 percent).

140.    Mar-Vel has received Government contracts totaling $162,874,496.89 between FY2009 and FY2013.  Of this total, Mar-Vel has received $85,091.03 from the U.S. Government and its agencies under small business set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

141.    Since FY2009, Mar-Vel has entered into at least five Government contracts that were set aside for small businesses, including four with the Department of Defense.   Some representative examples of Mar-Vel's small business set-aside contracts include:

| TOP 5 MAR-VEL SMALL BUSINESS SET-ASIDE CONTRACTS, FY 2009-2013 | | | | | |
|---|---|---|---|---|---|
| # | Funding | Contract # | FY | Size Standard | Total |
| 1 | DoD | SPM4A609M4941 | 2009 | 750 | $57,661.00 |
| 2 | DoD | W912PQ09P0038 | 2009 | 500 | $7,604.40 |
| 3 | EPA | EP093000093 | 2009 | $30.0MM | $7,200.00 |
| 4 | DoD | W9123709P0245 | 2009 | 100 | $6,775.17 |
| 5 | DoD | W912PQ09M0202 | 2009 | $7.0MM | $5,850.46 |

142.    At all times material hereto, Mar-Vel has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, Mar-Vel has self-certified to the Government that it has at least 33 full and part-time employees.

143.    However, a review of the SBA's affiliation factors reveals that Mar-Vel is affiliated with a number of other companies, including, but not limited to, Defendant ADS. Taken together, the combined total of affiliated employees for Mar-Vel is at least 900 employees, thus making Mar-Vel ineligible to bid on set-aside contracts for small business.

144.    For example, ADS shares common ownership and/or management with Mar-Vel. Specifically, in June 2008, ADS purchased 100 percent of the stock of Defendant Mar-Vel for $5,500,000.

145.    And when the number of employees of the affiliated entities is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding Mar-Vel from participating in most set-aside contracts.

146.    Each time Mar-Vel entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and "[u]nder 15 U.S.C. § 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

147.    These self-certifications were materially false when made.  Mar-Vel made false representations that Mar-Vel was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made Mar-Vel ineligible to bid as a small business under applicable rules and regulations. As a consequence of Mar-Vel's misrepresentations, the United States awarded contracts to Mar-Vel and paid monies for certain supplies and services from Mar-Vel that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that Mar-Vel did not constitute a small business concern under the applicable rules and regulations.

148.     Because they were induced by its fraudulent size certifications, all the set-aside contracts awarded to Mar-Vel after it became a wholly owned subsidiary of ADS were thus void *ab initio.*

149.     Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of Mar-Vel's misrepresentations.

### iii.     Defendant MJL Enterprises, LLC

150.     By virtue of ADS having controlling ownership and/or management in MJL Enterprises, MJL Enterprises has been affiliated with ADS for purposes of its small business status.

151.     MJL is a SDVOSB supplier of maintenance, repair and operations inventory, industrial supplies, medical equipment and safety/security supplies. MJL specializes in long-term U.S. Government military contracts for customers located all over the world, including law enforcement and first response.

152.     In 2007, MJL was owned 49 percent by Tactical Holdings (which was owned by Daniel J. Clarkson, Luke M. Hillier, Michael Hillier, Jr. and R. Scott LaRose in the amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively) and 51 percent by Martin Hierholzer.  From 2008 through 2011, MJL was entirely owned by Martin Hierholzer.

153.     Martin Hierholzer is the President of MJL, Inc. Hierholzer is a former employee of ADS, Inc., acting as Vice President of Sales and Business Development from 2002 to 2006.

154.     MJL represents that it provides the United States Department of Defense and other Federal Agencies "expedited service and product solutions utilizing an extensive offering of simple and practical Government contract options."  With only 7 fulltime employees, MJL still claims to maintain an inventory containing over 160,000 products, over 100,000 of which are listed on GSA Advantage.gov from MJL's Hardware Superstore schedule GS-21F-0020U.

155.    However, at all times material hereto, ADS has used MJL simply as a "pass through" entity in order to illegally win SDVOSB set-aside contracts.

156.    At all times material hereto, by virtue of ADS management and control over MJL and its operations, MJL was not an eligible SDVOSB.  Since the founding of MJL in 2006, ADS managed essentially all MJL's daily business operations.   For example, ADS prepared and submitted to the Government all the SDVOSB set-aside proposals for MJL, even using the ADS past performance experience in order to win SDVOSB set-aside contracts.  In addition, ADS staff performed essentially all of MJL's accounting and bookkeeping services, provided essentially all MJL's computer services through common network servers, and supplied the necessary logistical services to allow MJL to perform under its SDVOSB set-aside contracts.

157.    MJL has received Government contracts of $73,787,281 between FY2008 and FY2013.  Of this total, MJL has received $37,983,927.73 from the U.S. Government and its agencies under small business and SDVOSB set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

158.    Since FY2007, MJL has entered into at least 166 Government contracts that were set aside for SDVOSB, including 106 with the Department of Defense.  Some representative examples of MJL's small business set-aside contracts include:

| Top 8 MJL Small Business Set-aside contracts, FY2007-2013 | | | | |
|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | DoS | SAQMMA12M1457 | 2012 | 500 | $10,809,996.90 |
| 2 | DoD | W911QY10D0055 | 2010-2013 | 100 | $9,558,497.04 |
| 3 | VA | VA251C0574 | 2009-2010; 2013 | $33.5MM | $3,092,116.25 |
| 4 | DoD | W9124Q07D0808 | 2007-2008 | 500 | $1,597,400.00 |
| 5 | DoD | W9123609C0024 | 2009 | $14.0MM | $1,540,653.00 |
| 6 | VA | VA246C0510 | 2009-2010 | $33.5MM | $1,317,250.00 |
| 7 | DoD | H9224012C0023 | 2012 | 500 | $1,080,025.82 |
| 8 | DoS | SAQMMA11M2401 | 2011 | 100 | $799,220.43 |

159.    At all times material hereto, MJL has self-certified to the Government that it is eligible to bid on small business and SDVOSB set-aside contracts.  For instance, MJL has self-certified to the Government that it is an eligible SDVOSB, having at least 7 full and part-time employees, though other sources reflect that MJL has had at least 13 employees.  MJL has also certified that it is majority-owned by one or more service-disabled veterans who manage and control daily business operations.  Finally, at all times material hereto, MJL has self-certified to the Government that its average annual receipts over the past three years have been $10,000,000.

160.    However, a review of the SBA's affiliation factors reveals that MJL is affiliated with a number of the ADS Affiliated Defendants, including, but not limited to, Defendant ADS. Taken together, the combined total of affiliated employees for MJL is at least 900 employees, thus making MJL ineligible to bid on set-aside contracts for small business.

161.    For example, MJL has been described by a former ADS employee as a "spin-off" of ADS, revealing that the ability to exercise control and management lies with ADS.   In addition, ADS' holding company (which itself was owned by Daniel J. Clarkson, Luke M. Hillier, Michael Hillier, Jr. and R. Scott LaRose) owned 49 percent of MJL in 2007.  Also, as described above, ADS provided substantial assistance to MJL's operations from at least 2007 through 2009.

162.    MJL shares common ownership and/or management with ADS.  MJL founder Martin Hierholzer even registered an entity in the Central Contractor Registration ("CCR") named "MJL/ADS" on June 11, 2008 under the DUNS number (809526333), and renewed its registration every year until 2011.   Finally, ADS' holding company (which itself was owned by Daniel J. Clarkson, Luke M. Hillier, Michael Hillier, Jr. and R. Scott LaRose) owned 49 percent

of MJL in 2007. Also, as described above, ADS provided substantial assistance to MJL's operations from at least 2007 through 2009.

163.    And when the number of employees of the ADS Affiliated Defendants is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding MJL from participating in most set-aside contracts.

164.    Each time MJL entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and  "[u]nder 15 U.S.C. § 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

165.    MJL's most recent annual self-certification, in which it avers that it is a small business concern, was made on August 14, 2013 by Scott Overton, Construction Program Director.

166.    These self-certifications were materially false when made.  MJL made false representations that MJL was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made MJL ineligible to bid as a small business under applicable rules and regulations.  As a consequence of MJL's misrepresentations, the United States awarded contracts to MJL and paid monies for certain supplies and services from MJL that it would not otherwise have paid had it been fully aware of the nature of the combined

affiliated entity and that MJL did not constitute a small business concern under the applicable rules and regulations.

167.   Because they were induced by its fraudulent size certifications, all the small business and SDVOSB set-aside contracts awarded to MJL were thus void *ab initio.*

168.   Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of MJL's misrepresentations.

### iv.     Defendant SEK Solutions, LLC

169.   By virtue of ADS' controlling ownership and/or management in SEK, SEK has at all times material hereto been affiliated with ADS for purposes of its EDWOSB and WOSB status.

170.   SEK is an EDWOSB. Since 1999, SEK has provided tactical and technical equipment and services to numerous Federal and military customers. SEK graduated from the 8(a) program and has helped to develop issuing, inventory management, and logistical support systems for the U.S. Naval School for Explosive Ordinance Disposal, the Pentagon Police Force Agency, and CENTCOM. SEK has also manufactured prototype items for the U.S. Army's 160th Special Operations Aviation Regiment and the U.S. Marine Corps Systems Command. SEK has benefited from working closely with its customers to provide mission critical support and regularly meets with its customers to evaluate best practices and to resolve any concerns in order to exceed expectations.

171.   SEK generates a significant portion of all of its sales from EDWOSB set-aside contracts with the U.S. Government and its agencies, primarily the agencies and offices within the Departments of Defense and Homeland Security.  Between FY2007 and FY2013, SEK's contracts from U.S. Government agencies totaled $242,867,941.36.   Of this total, $72,712,119.91 from the U.S. Government and its agencies under small business and EDWOSB

43

set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

172.   Since FY2007, SEK has entered into at least 402 Government EDWOSB contracts set aside for small businesses, including 324 with the Department of Defense and 23 with the Department of Homeland Security.   Some representative examples of SEK's small business set-aside contracts include:

| | | Top 8 SEK Solutions, LLC Small Business Set-aside contracts, FY 2007-2013 | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | HHS | HHSM500200800014C | 2008-2010 | $25.0 | $4,459,422.61 |
| 2 | DoD | W91CRB09D0020 | 2009 | 500 | $3,443,353.86 |
| 3 | DHS | HSBP1010C00118 | 2010 | 500 | $3,404,000.00 |
| 4 | DoD | GS04T10BFP0027 | 2010-2011 | $35.5 | $3,402,357.43 |
| 5 | DoD | W9124L07C0006 | 2007-2010 | $7.0 | $3,354,182.54 |
| 6 | DoD | FA480308P0032 | 2008 | 500 | $2,927,397.00 |
| 7 | DoD | W9124L07C0006 | 2011-2012 | $7.0 | $2,649,723.70 |
| 8 | DoD | W912D010P0230 | 2010 | 100 | $2,600,000.00 |

173.   However, at all times material hereto, ADS has used SEK simply as a "pass through" entity in order to illegally bid on small business, EDWOSB and WOSB set-aside contracts that ADS would otherwise be ineligible to bid on.

174.   At all times material hereto, by virtue of ADS management and control, SEK was not an eligible EDWOSB and WOSB. Since at least 2007, ADS managed the daily business operations of SEK. For example, ADS prepared all the EDWOSB and WOSB set-aside proposals for SEK, and used the ADS past performance experience in order to win EDWOSB and WOSB set-aside contracts. For example, ADS provided all its computer services through common network servers, and supplied the necessary logistical services in order for SEK to perform under its EDWOSB and WOSB set-aside contracts.

175.    At all times material hereto, SEK has self-certified to the Government that it is eligible to bid on small business set-aside contracts.   For instance, SEK has certified to the Government that it has at least 30 employees.  In addition, SEK has certified to the Government that its average annual receipts over the past three years have been $28,000,000.

176.    However, a review of the SBA's affiliation factors reveals that SEK is affiliated with a number of the ADS Affiliated Defendants, including, but not limited to, Defendant ADS. Taken together, the combined total of affiliated employees for SEK is at least 900 employees, thus making SEK ineligible to bid on EDWOSB and WOSB set-aside contracts.

177.    For example, SEK Solutions has been described as a "spin-off" of ADS, suggesting that the ability to exercise control and management lies with ADS.  In addition, SEK shares the exact same address (down to the suite number) as co-conspirator Tactical Distributors. Based on their shared addresses, in combination with the other factors discussed *supra*, SEK is affiliated with ADS under SBA rules and regulations.

178.    And when the number of employees of the affiliated entities is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding SEK from participating in most set-aside contracts.

179.    Each time SEK entered into a contract with the Government and each time it filed its annual self-certification, it certified that it was a "small business" and  "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and

debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

180.    SEK's most recent annual certification, in which it avers that it is a small business concern, was made on September 27, 2013 by Sheri Harris, SEK Accountant.

181.    These certifications were materially false when made. SEK made false representations that SEK was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made SEK ineligible to bid as a small business under applicable rules and regulations.   As a consequence of SEK's misrepresentations, the United States awarded contracts to SEK and paid monies for certain supplies and services from SEK that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that SEK did not constitute a small business concern under the applicable rules and regulations.

182.    Because they were induced by its fraudulent size certifications, all the small business, EDWOSB and WOSB set-aside contracts awarded to SEK were thus void *ab initio.*

183.    Also, legitimate, eligible small businesses were denied awarding of these contract opportunities because of SEK's misrepresentations.

### 2.    Defendant Mythics, Inc.

184.    Mythics has at all times material hereto been affiliated with ADS, Inc. for purposes of its size status by virtue of ADS' controlling ownership, common management and/or identity of interests.

185.    Luke M. Hillier, R. Scott LaRose, and Michael A. Hillier, Jr. founded Mythics, Inc. in 1999.  Mythics was formally incorporated on April 18, 2000 and commenced operations that same year.  Mythics sells computer software and related support services to Government, commercial, and retail customers, principally in the United States and in this judicial district.

186.    Between 2007 and 2009, Luke M. Hillier, Michael Hillier, Jr. and R. Scott LaRose each owned 33.3 percent of Mythics.  Thereafter, Mythics has been owned by Luke M. Hillier, Michael Hillier, Jr., R. Scott LaRose and Charles M. Salle (ADS' General Counsel), 3.33 percent, 33.33 percent, 13 percent and 50.33 percent, respectively.

187.    Mythics' senior management has included R. Scott LaRose (CEO and President); Gary Newman (Chief Operating Officer and Executive Vice President); Gregory Christensen (Vice President, also CEO of Emergent); Shane Smutz (Vice President); and Richard Welborn (Chief Financial Officer).

188.    Mythics was originally conceived as an Oracle-based information system solutions provider, interfacing with Federal, state and local government agencies, health care and higher education facilities.  Both Luke Hiller and LaRose were former Oracle employees, where LaRose worked as the regional manager in its state and local government division and Hillier was a lead sales representative in the sales division.  Mythics provides a full range of end-to-end information system solutions in software, hardware, consulting services, implementation, financing, support and training.  In 2004, Mythics won Oracle's Partner of the Year award, and the company currently is the largest Oracle Software reseller.

189.    Mythics refers to itself as "an award winning Oracle systems integrator, consulting firm and Platinum level member of Oracle PartnerNetwork (GSA#: GS-35F-0153M)."  Mythics also states that it "provides complete technology solutions for the Federal Government, State and Local Governments" and "is a trusted partner to organizations worldwide."

190.    Mythics' sales growth has been dramatic.   From a garage start-up, Mythics generated $197 million in sales in 2011, nearly $240 million in 2012 and is estimated to have sales exceeding $300 million in 2013.

191.    Mythics generates a significant portion of all of its sales from contracts with the U.S. Government and its agencies, primarily the agencies and offices within the Departments of Defense and Homeland Security.  Between FY2007 and FY2013, Mythics' contracts from U.S. Government agencies totaled $1,396,467,367.54.  Of this total, $33,528,290.21 from the U.S. Government and its agencies under small business set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

192.   Since FY2007, Mythics has entered into at least seventy-five Government contracts that were set aside for small businesses, including twenty-one with the Department of Homeland Security and fifteen with the Department of Commerce.   Some representative examples of Mythics' small business set-aside contracts include:

| TOP 8 MYTHICS SMALL BUSINESS SET-ASIDE CONTRACTS, FY2007-2014 | | | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | DHS | HSHQPA05D00007 | 2010 | $25.0MM | $7,592,917.82 |
| 2 | DHS | HSHQPA05D00007 | 2010 | $25.0MM | $6,435,763.15 |
| 3 | DHS | HSHQPA05D00007 | 2010 | $25.0MM | $5,540,361.43 |
| 4 | DHS | HSHQDC13A00040 | 2014 | $25.5MM | $3,091,353.60 |
| 5 | DHS | HSHQPA05D00007 | 2009-2010 | $25.0MM | $2,900,047.09 |
| 6 | DHS | HSHQPA05D00007 | 2010 | $25.0MM | $2,333,038.47 |
| 7 | DOC | GS35F0153M | 2013 | $25.5MM | $1,576,240.00 |
| 8 | DHS | HSHQPA05D00007 | 2010 | $25.0MM | $710,023.01 |

193.    At all times material hereto, Mythics has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, Mythics has self-certified to the Government that it has at least 256 employees.  In addition, Mythics has self-certified to the

Government that its average annual receipts over the past three years have been $450,000,000. Notably, both Mythics' employee and average annual receipts figures are *identical* to those reported to the Government by Defendant Emergent.

194.   However, a review of the SBA's affiliation factors reveals that Mythics is affiliated with a number of other companies, including, but not limited to, Defendant ADS. Taken together, the combined total of affiliated employees for Mythics is at least 900 employees, thus making Mythics ineligible to bid on set-aside contracts for small business.

195.   For example, Mythics shares common ownership with both ADS and Agilex. Specifically, as described *supra*, Defendants Luke Hillier, Scott LaRose, Daniel Clarkson, Michael Hillier, Jr., and Charles Salle each hold ownership interests in ADS, Mythics, and Agilex, in percentages sufficient to exercise control over each of the other companies.

196.   Further, Mythics shares common management with these other companies because Defendants Luke Hillier, LaRose, Clarkson, Hillier, Jr., and Salle have the ability to exercise critical influence or substantive control at all three companies.  For instance, Defendant Luke Hillier, ADS' President and CEO was also the CEO of Mythics from its founding in 2000 through 2009, while also serving as a board member of Defendant Emergent.   Defendant Michael A. Hillier, Jr. currently serves as a member of ADS' Board of Directors, while also serving as Mythics' Chief Operating Officer from 2001 to 2006.  Hillier, Jr. is also an Officer and Director of Defendant Iron Brick.

197.   LaRose is a co-founder of Mythics and served as the company's Vice President from 2000-2003 and as its President until early 2013.  LaRose continues to act as a Director of Mythics (a position he has held since 2000) and owns a 13 percent stake in the company.  In addition to his substantial connections to Mythics, LaRose has also been a member of ADS'

Board of Directors since 2003, and owns a 24.95 percent stake in ADS. Further, since 2009, LaRose has been the Chairman of the Board of Defendant Agilex Technologies. Finally, LaRose was the original registered agent and member of Defendant Emergent.

198.   And while Defendant Charles Salle serves as ADS' General Counsel, he also acted as the Secretary and Director of Mythics from 2007 through 2009.

199.   Mythics is also affiliated based on its identity of interest with these other companies. Brothers Luke M. Hillier and Michael A. Hillier, Jr., along with Defendant Scott LaRose, founded Mythics in 1999. Of the total ownership, brothers Luke Hillier and Michael Hillier, Jr. own 3.33 percent and 33.33 percent, respectively. Michael A. Hillier, Jr. has owned 33.3 percent of Mythics from at least 2008 through at least 2011, served as Mythics' Chief Operating Officer from 2001 to 2006, and currently serves as a member of ADS' Board of Directors. Meanwhile, Luke Hillier, the CEO of ADS was also the CEO of Mythics from its founding in 2000 through 2009.

200.   There has been, and continues to be, substantial involvement by Luke and Michael Hillier, Jr. in the operations of both Mythics and ADS. Because of the identity of interests in Mythics and ADS, these companies are affiliated under SBA rules and regulations.

201.   And when the number of employees of the affiliated entities is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding Mythics from participating in most set-aside contracts.

202.   Each time Mythics entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant

to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

203.    Mythics' most recent annual self-certification, in which it avers that it is a small business concern, was made on July 9, 2013 by Dale Darr, Vice President of Contracts and Compliance.

204.    These self-certifications were materially false when made. Mythics made false representations that it was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made Mythics ineligible to bid as a small business under applicable rules and regulations.  As a consequence of Mythics' misrepresentations, the United States awarded contracts to Mythics and paid monies for certain supplies and services from Mythics that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that Mythics did not constitute a small business concern under the applicable rules and regulations.

205.    Because they were induced by its fraudulent size certifications, all the small business set-aside contracts awarded to Mythics were thus void *ab initio*.

206.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of Mythics' misrepresentations.

### i.    Defendant Emergent, LLC

207.    By virtue of Mythics' controlling ownership and/or management in Emergent, Emergent has at all times material hereto been affiliated with Mythics and ADS for purposes of its small business status.

208.    Emergent is a wholly-owned subsidiary of Mythics.  Mythics, in turn, is owned by Luke M. Hillier, Michael Hillier, Jr., R. Scott LaRose and Charles M. Salle (ADS' General Counsel), 3.33 percent, 33.33 percent, 13 percent and 50.33 percent, respectively.  By virtue of Mythics' controlling ownership and/or management in Emergent, Emergent has at all times material hereto been affiliated with Mythics and ADS for purposes of its small business status.

209.    Emergent, a small business and IT solutions provider, is also a Value Added Reseller (VAR) and GSA Schedule Holder (GS-35F-0119W), providing IT product acquisition, consulting and training services.   Emergent offers complimentary technology solutions including, Adobe, Red Hat, Symantec and VeriSign, among others within the Government, commercial, education and healthcare sectors.

210.    President and CEO Greg Christensen (also a Vice President at Mythics) spent almost ten years working in Federal sales and sales management at Oracle Corporation beginning in 1993.  Subsequently, he led the Federal sales team at Mythics, Inc. Christensen also co-founded Mythics Professional Services (a Mythics, Inc. subsidiary) in 2003. Other Emergent executives include Executive Vice President Paul Kohler, Vice President of Corporate Development James Flint, and Vice President of Enterprise Solutions, Mike Connor.

211.    Beyond its President and CEO also serving as a VP at Mythics, Emergent shares numerous other management employees with Mythics.  For example, Emergent Vice President of Corporate Development James Flint simultaneously serves as Vice President of Corporate Development at Mythics, Inc., a position he has held since 2010.  Christopher Richards also serves as the Vice President of Marketing & Customer Service for both Mythics and Emergent. Richards has been employed by Mythics, Inc. since 2007.  Since 2011, Keith Whidden has served in an IT/Technical Support for both Mythics and Emergent.  Thomas Zell has been

employed by Mythics as the Director of Information Technology since March 2003, and has held the same position at Emergent since 2007.  Since 2007, Greg Mika has been employed by both Mythics and Emergent as a Technical Director.  Corporate Recruiter Christy Monsour has also done recruiting work for both Mythics and Emergent.

212.   Emergent has received Government contracts of $75,212,517.03 between FY2008 and FY2013.  Of this total, Emergent has received $3,313,222.49 from the U.S. Government and its agencies under small business set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

213.   Since FY2007, Emergent has entered into at least eighty-two Government contracts that were set aside for small businesses, including fourteen with the Department of Defense, fourteen with the Department of Commerce and thirteen with the Department of the Interior.  Some representative examples of Emergent's small business set-aside contracts include:

| TOP 8 EMERGENT SMALL BUSINESS SET-ASIDE CONTRACTS, FY 2007-2013 | | | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year(s) | Size Standard | Total |
| 1 | HHS | HHSF223201010032B | 2010; 2013 | $25.0 | $1,462,440.33 |
| 2 | DHS | HSHQDC12P00104 | 2012 | $25.0 | $350,000.00 |
| 3 | HHS | HHSN261201200248P | 2012 | 100 | $133,488.00 |
| 4 | DOT | TMHQ13P0047 | 2013 | 100 | $107,754.23 |
| 5 | HHS | HHSN263200200551I | 2013 | 1000 | $103,723.71 |
| 6 | DoD | SP470712M0030 | 2012 | $25.0 | $73,064.43 |
| 7 | DoS | SAQMMA10M2659 | 2010 | $25.0 | $71,964.91 |
| 8 | OPM | OPM3213P0046 | 2013 | $25.0 | $71,009.50 |

214.   Emergent has experienced rapid growth since its founding in 2006 thanks in part to its Government contracts.  In 2011, it recorded a three year growth rate of 1,063 percent.  It has been named to lists of fastest-growing solutions providers by revenue for the last three years. In 2010, it had $28.4 million in revenue.

215.    At all times material hereto, Emergent has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, Emergent has self-certified to the Government that it has at least 256 employees.  In addition, Emergent has self-certified to the Government that its average annual receipts over the past three years have been $450,000,000.  Notably, both Emergent's employee and average annual receipts figures are *identical* to those reported to the Government by Defendant Mythics.

216.    However, a review of the SBA's affiliation factors reveals that Emergent is affiliated with a number of other companies, including, but not limited to, Defendants Mythics and ADS.  Taken together, the combined total of affiliated employees for Emergent is at least 900 employees, thus making Emergent ineligible to bid on set-aside contracts for small business.

217.    For example, Emergent shares common management with Mythics.  Specifically, Defendant Luke Hillier, a Board member at Emergent, is also the President and CEO of ADS and previously served as the CEO of Mythics from its founding in 2000 through 2009.

218.    Further, in addition to reporting the same number of employees and average revenues as Mythics, Emergent also previously shared the exact same place of business as Mythics.  Both companies have reported their principal place of business as being 1439 N. Great Neck Road, Virginia Beach, Virginia.  That address is also the same principal place of business of Defendant Iron Brick Associates, LLC.  Based on their shared addresses, in combination with the other factors discussed *supra*, Emergent is affiliated under SBA rules and regulations.

219.    And, when the number of employees of the affiliated entities is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding Emergent from participating in most set-aside contracts.

220.    Each time Emergent entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and  "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

221.    Emergent's most recent annual self-certification, in which it avers that it is a small business concern, was made on September 18, 2013 by Jennifer Libby, Emergent's Partner Contracts Administrator.

222.    These self-certifications were materially false when made.  Emergent made false representations that Emergent was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made Emergent ineligible to bid as a small business under applicable rules and regulations.   As a consequence of Emergent's misrepresentations, the United States awarded contracts to the Emergent and paid monies for certain supplies and services from Emergent that it would not otherwise have paid been fully aware of the nature of the combined affiliated entities and that Emergent did not constitute a small business concern under the applicable rules and regulations.

223.    Because they were induced by its fraudulent size certifications, all the small business set-aside contracts awarded to Emergent were thus void *ab initio.*

224.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of Emergent's misrepresentations.

### ii.    Defendant IronBrick Ltd./Iron Brick Associates, LLC

225.    By virtue of Mythics' controlling ownership and/or management in Iron Brick, Iron Brick has at all times material hereto been affiliated with Mythics for purposes of its small business status.

226.    IronBrick Ltd. is a Virginia limited liability company with a principal place of business at 1439 N. Great Neck Rd., Virginia Beach, Virginia, and was founded on February 7, 2006.  Iron Brick Associates, LLC is a Virginia limited liability company with a principal place of business at 1439 N. Great Neck Rd. Suite 201, Virginia Beach, Virginia, and was founded on April 21, 2006.

227.    Upon information and belief, both IronBrick Ltd. and Iron Brick Associates, LLC (collectively "Iron Brick"), were founded by R. Scott LaRose.  LaRose acted as an officer and a director of Iron Brick, Ltd. between 2007 and 2010 and Michael A. Hillier, Jr. worked as an officer and a director between 2007 and 2009.  Iron Brick is a leading provider of storage and data management solutions.

228.    Iron Brick Associates, LLC has received Government contracts of $10,501,936 between FY2008 and FY2013. Of this total, Iron Brick has received $2,426,530 from the U.S. Government and its agencies under small business set-aside contracts—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

229.    Since FY2007, Iron Brick has entered into at least seventy Government contracts that were set aside for small businesses, including thirty-seven with the Department of Defense. Some representative examples of Iron Brick's small business set-aside contracts include:

56

| | | TOP 8 IRON BRICK SMALL BUSINESS SET-ASIDE CONTRACTS, FY 2007-2013 | | | |
|---|---|---|---|---|---|
| # | Funding Agency | Contract # | Fiscal Year | Size Standard | Total |
| 1 | DoD | N0010413MQ315 | 2013 | 1000 | $739,275.04 |
| 2 | DoD | N0010410MQT55 | 2010 | 1000 | $189,924.82 |
| 3 | DoD | H9225709P0048 | 2009 | 1000 | $112,950.00 |
| 4 | DoD | M6785410P4261 | 2010 | 100 | $99,999.42 |
| 5 | DoD | W9133L10P0251 | 2010 | 100 | $92,345.68 |
| 6 | HHS | HHSN273201000344P | 2010 | $25.5 MM | $73,585.04 |
| 7 | DOC | DOCSB134212AU0006 | 2012 | 100 | $71,427.95 |
| 8 | DoD | M6785410P4335 | 2010 | 1000 | $66,643.55 |

230.    At all times material hereto, Iron Brick has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, Iron Brick Associates, LLC has self-certified to the Government that it has had at least 17 full and part-time employees and IronBrick, Ltd. has self-certified to the Government that it has had at least 4 full and part-time employees. In addition, Iron Brick Associates, LLC and IronBrick, Ltd. have certified to the Government that their average annual receipts over the past three years have been $20,000,000 and $1,000,000, respectively.

231.    However, a review of the SBA's affiliation factors reveals that Iron Brick is affiliated with a number of other companies, including, but not limited to, Defendants ADS and Mythics.  Taken together, the combined total of affiliated employees for Iron Brick is at least 900 employees, thus making Iron Brick ineligible to bid on set-aside contracts for small business.

232.    For example, Iron Brick shares common management with ADS and Mythics. Specifically, Defendant Michael A. Hillier, Jr., who is an Officer and Director of Iron Brick, also currently is a member of ADS' Board of Directors and previously served as Mythics' Chief Operating Officer from 2001 to 2006.  Defendant LaRose, who founded IronBrick, Ltd. in 2007

and acted as an Officer and Director until 2010, has been a member of ADS' Board of Directors since 2003, and owns a 24.95 percent stake in the company. LaRose's work outside Iron Brick also includes his management role at Defendant Mythics, which he co-founded in 1999 and in which he holds a 13 percent ownership stake. Specifically, LaRose served as Mythics' Vice President from 2000-2003 and as its President until early 2013. LaRose continues to act as a Director of Mythics, a position he has held since 2000. In addition, LaRose became Agilex's Chairman of the Board in 2009.

233. Further, Iron Brick lists as its principal place of business the exact same address as does Mythics. Both companies have reported their principal place of business as being 1439 N. Great Neck Road, Virginia Beach, Virginia. Based on their shared addresses, in combination with the other factors discussed *supra*, Iron Brick is affiliated under SBA rules and regulations.

234. And when the number of employees of the affiliated entities is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding Iron Brick from participating in most set-aside contracts.

235. Each time Iron Brick and IronBrick entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

236.    Iron Brick Associates, LLC's most recent annual self-certification, in which it avers that it is a small business concern, was made on July 23, 2013 by Laura Frost, Iron Brick Associates, LLC's Senior Accountant.

237.    These self-certifications were materially false when made.  Iron Brick made false representations that Iron Brick was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made Iron Brick ineligible to bid as small businesses under applicable rules and regulations.  As a consequence of their misrepresentations, the United States awarded contracts to Iron Brick and paid monies for certain supplies and services from Iron Brick that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that Iron Brick did not constitute small business concerns under the applicable rules and regulations.

238.    Because they were induced by its fraudulent size certifications, all the small business set-aside contracts awarded to Iron Brick were thus void *ab initio*.

239.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of Iron Brick's misrepresentations.

### 3.    Defendant Agilex Technologies, LLC

240.    By virtue of the ADS and Mythics principals' controlling ownership and/or management in Agilex, Agilex has since at least 2009 been affiliated with ADS and Mythics for purposes of its small business status.

241.    Agilex was founded by Robert E. LaRose and Jay Nussbaum in 2007.  Agilex is a leading provider of mission and technology solutions to the national and homeland security, healthcare, and public sectors.  One of Agilex's specialties is public and Federal sector solutions for Oracle products.  Its clients include the Departments of Defense, Health & Human Services, Homeland Security, Justice, and Veterans Affairs.

242.    R. Scott LaRose became Agilex's Chairman of the Board in 2009.  Other members of Agilex's executive leadership include Vice Chairman Jay Nussbaum and President John Gall.

243.    From its founding in 2007 through 2010, Agilex expanded rapidly, recording 2,191.94 percent growth, the majority of which came from Federal contracts.  Between FY2009 and FY2013 it received a total of $64,949,029.40 in Federal contracts.  Of this, Agilex received contracts $3,464,348.23 the U.S. Government and its agencies under small business set-aside contracts from the U.S. Government and its agencies—contracts that were void *ab initio* because it was ineligible to bid on small business set-aside contracts.

244.    A representative example of Agilex's small business set-aside contracts include:

| AGILEX SMALL BUSINESS SET-ASIDE CONTRACTS, FY2009-2013 | | | | |
|---|---|---|---|---|
| Funding Agency | Contract # | Fiscal Year | Size Standard | Total |
| HHS | HHSN316201200113W | 2013 | $25.0 MM | $3,464,348.23 |

245.    Agilex's net sales for the year that ended December 31, 2012 were approximately $110 million, which reflected a 30 percent growth rate.

246.    At all times material hereto, Agilex has self-certified to the Government that it is eligible to bid on small business set-aside contracts.  For instance, Agilex has self-certified to the Government that it has at least 406 employees, though other sources reflect that Agilex has had over 500 full and part-time employees.  In addition, Agilex has self-certified to the Government that its average annual receipts over the past three years have been $85,867,000.

247.    However, a review of the SBA's affiliation factors reveals that Agilex is affiliated with a number of other companies, including, but not limited to, Defendants Mythics and ADS. Taken together, the combined total of affiliated employees for Agilex is at least 900 employees, thus making Agilex ineligible to bid on set-aside contracts for small business.

60

248.    For example, Agilex shares common management with ADS and Mythics. Specifically, Defendant R. Scott LaRose became Agilex's Chairman of the Board in 2009.   In addition to his work for Agilex, LaRose has acted as Mythics' Executive Vice President, and since 2004, he has acted as Mythics' President and Director.   In 2010, LaRose assumed the role of CEO.   LaRose also co-founded IronBrick, Ltd. and Iron Brick Associates in or about 2006, and continues to serve as a Director for the company.   LaRose is also a Director of ADS.

249.    And when the number of employees of the affiliated entities, including ADS and Mythics, is combined, they far exceed the size standards assigned to the small business set-aside contracts, thus precluding Agilex from participating in most set-aside contracts.

250.    Each time Agilex entered into a contract with the Government and each time it filed its annual self-certification, it self-certified that it was a "small business" and   "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

251.    Agilex's most recent annual self-certification, in which it avers that it is a small business concern, was made on October 4, 2013 by John Harllee, Agilex's Vice President of Contracts and General Counsel.

252.    These self-certifications were materially false when made.   Agilex made false representations that Agilex was a small business, when it was, in fact, affiliated with the Defendants and the other affiliated entities, which made Agilex ineligible to bid as a small

61

business under applicable rules and regulations. As a consequence of Agilex's misrepresentations, the United States awarded contracts to Agilex and paid monies for certain supplies and services from Agilex that it would not otherwise have paid had it been fully aware of the nature of the combined affiliated entity and that Agilex did not constitute a small business concern under the applicable rules and regulations.

253.    Because they were induced by its fraudulent size certifications, all the small business set-aside contracts awarded to Agilex were thus void *ab initio.*

254.    Also, other legitimate, eligible small businesses were denied awarding of these contract opportunities because of Agilex's misrepresentations.

### 4.      Defendant Luke M. Hillier

255.    Luke M. Hillier has been the Chairman and Chief Executive Officer of ADS Tactical, Inc. since 2000 and 2004 respectively.   Hillier also serves as the Chief Executive Officer at ADS, Inc.

256.    After Hillier graduated from Old Dominion University, he began his career in Acquisition Management for Naval Air Systems Command in the U.S. Federal Government.  He subsequently joined Oracle Corporation as a Lead Sales Representatives in the State and Local Government sales division. Fellow Oracle employees included Gregory Christensen and R. Scott LaRose.

257.    Hillier then founded Mythics, Inc. with R. Scott LaRose and Michael A. Hillier, Jr. in 1999.  Hillier served as CEO of Mythics from 1999 until at least 2009.  He continued to act as the company's Vice President through 2011.

258.    In or about 2000, Hillier also joined his father Michael Hillier, Sr.'s company, Atlantic Diving Supply, Inc., with R. Scott LaRose, Michael Hillier, Jr., and Daniel Clarkson.

Charles M. Salle has also been affiliated with the company since at least 1998, when he served as the Secretary, and later became ADS' Vice President in 2012.

259.    From ADS alone (and not counting any revenues received from his interests in other numerous ventures such as Mythics), during years 2009 through 2011, ADS distributed some $284.47 million to Luke M. Hillier, most of it coming from fraudulent SBA set-aside contracts.

260.    Hillier has used revenues from fraudulent SBA set-aside contracts to fund an opulent lifestyle quite different from the Oceana, Virginia trailer park where he grew up.  On December 17, 2009, he purchased his 17,158 square foot ocean front home at 5000 Ocean Front Ave, Virginia Beach, Virginia 23451, for $7.6 million.  In addition, Hillier also owns another house located at 4700 Ocean Front Avenue he purchased on June 13, 2008 for $4.75 million. His other personal amenities include numerous automobiles (one a Ferrari); two yachts (the 38-foot *Daddy's Girl Too* and the 61-foot *Grace*); and several airplanes through ADS, Inc., as well as a private 22-seat 1992 Gulfstream Aerospace G-IV, owned by ADS' wholly owned subsidiary, Hillier GIV, LLC.

### 5.    Defendant Michael A. Hillier, Jr.

261.    Michael A. Hillier, Jr. is the co-founder of Mythics, Inc. and has also at all times material hereto worked in management for both ADS, Inc. and IronBrick, Ltd.

262.    Hillier, Jr. attended Radford University, and met R. Scott LaRose there through the Sigma Pi Epsilon fraternity.  After graduation, Hillier, Jr. and his brother Luke Hillier both worked for LaRose in government sales at Oracle Corporation, until they founded Mythics together in 1999.  Hillier, Jr. acted as Chief Operating Officer and Director of Mythics from 1999 until 2007.  He owns a 33.33 percent stake in Mythics, Inc. (and thereby also its subsidiary Emergent, LLC). Hillier, Jr. is currently the President of Mythics Professional Services.

263.    In or about 2000, Hillier Jr. also joined his father Michael Hiller, Sr.'s company, ADS, along with Luke Hillier and R. Scott LaRose.  Hillier, Jr. acted as a Director of ADS from 2003 until at least 2008, and continues to own 16.67 percent of ADS affiliate Tactical Properties, LLC.

264.    Hillier, Jr. also co-founded Mythics subsidiary Mythics Professional Services, Inc. in 2004, and acted as its Treasurer and Secretary until 2009. He was also co-founded with R. Scott LaRose IronBrick, Ltd., acting as an officer and director from its founding in 2006 until 2009.

265.    Hillier, Jr.'s business revenues, generated primarily through Government contracting profits, have enabled him to live a very comfortable lifestyle, especially in contrast to the trailer park in which he grew up.  His current beachfront residence at 4200 Sandy Bay Drive, Virginia Beach, Virginia 23455 is worth an estimated $2.4 million.  Previous residences have included a $2.4 million Palm Beach Gardens, Florida and a $4.7 million Virginia Beach beachfront home.

### 6.      Defendant R. Scott LaRose

266.    After graduating from Radford University, LaRose worked with Luke Hillier, Michael Hillier, Jr. and Greg Christensen at Oracle Corporation, where he was employed as the Regional Manager of the state and local government division.

267.    Along with Hillier and Christensen, LaRose left Oracle to form Mythics in 2000. From 2000 to 2003, he acted as the company's Executive Vice President, and since 2004, he has acted as the company's President and Director.  In 2010, he also assumed the role of Mythics CEO from Hillier.  LaRose would also join ADS, Inc. with Hillier, Daniel Clarkson, and Michael Hillier, Jr in or about 2000.  Since 2002, LaRose has been a Director of ADS, Inc.

268.     In addition to Mythics and ADS, LaRose has held executive positions at a number of other companies.  Since 2009, LaRose has served as the Chairman of the Board for Agilex Technologies, Inc., a company founded by his father, Robert E. LaRose.  He also co-founded IronBrick, Ltd. and Iron Brick Associates in or about 2006, and continues to serve as a Director. IronBrick, Ltd employed Luke Hillier's brother Michael Hillier, Jr. as an officer and a Director between 2007 and 2009.  LaRose also sits on the board the Hillier-LaRose Foundation.

269.     From ADS alone (and not counting any revenues received from his other numerous ventures), during years 2009 through 2011, ADS distributed some $121.48 million to LaRose, most of it coming from fraudulent SBA set-aside contracts.

### 7.     Defendant Daniel J. Clarkson

270.     Daniel J. Clarkson is the Vice Chairman of the Board of Directors at ADS Tactical, Inc.  From July 2012 through December 2012, Clarkson served as the President at ADS Tactical, Inc.  Clarkson also served as the Chief Operating Officer at ADS Tactical, Inc. from 2002 to July 2012, in addition to his previous roles as its Vice President, Treasurer and Secretary.

271.     Clarkson previously served as Regional Manager for Sunbelt Rentals, an equipment rental company based in South Carolina and owned by U.K.-based Ashtead Group, from 2000 to 2002. He started his career in sales and as Profit Center Manager for Sunbelt Rentals.  Clarkson has been a Director at ADS Tactical, Inc. since 2002.

272.     From ADS alone (and not counting any revenues received from his other numerous ventures), during years 2009 through 2011, ADS distributed some $80.97 million to Clarkson, most of it coming from fraudulent SBA set-aside contracts.

### 8.   Defendant Charles M. Salle

273.    Defendant Charles M. Salle is the current General Counsel and Vice President of ADS, Inc.

274.    Salle is a lawyer who graduated from Old Dominion University in 1968 and the Marshall Wythe School of Law at the College of William & Mary in 1971.  He began his career as Virginia Beach's Deputy City attorney from 1973-1985, Special Assistant to City Attorney, City of Virginia Beach from 1985-1992, and as the Vice-Chairman of the Virginia Beach Board of Zoning Appeals from 1990-1995.  He was an attorney at the law firm of Pender & Coward until in or about 2008.

275.    Charles Salle has been involved with ADS, Inc. since its beginnings.  He helped found the company in or about 1998 along with Michael Hillier, Sr. (President) and Allen Cromer (Vice President), acting as the Secretary/Treasurer between 1998 and 2001, and additionally became Vice President in 2002, a role he still holds.  At all times material hereto, Salle has also acted as ADS' General Counsel.

276.    Salle has considerable involvement in the creation and management of a number of the ADS Affiliated Defendants.  He has acted as the Secretary and a Director of Mythics, Inc. from 2007-2009, and in or about 2010, and purchased a 50.33 percent majority stake in Mythics, Inc., a thriving business concern having, at that time, nearly $200 million in annual revenue and over 200 employees. He also held a 16.67 percent stake in Tactical Properties, LLC in 2011 (described in detail below).  And, Salle has owned a 100 percent stake in Tactical Holdings, LLC (described in detail below) from 2008 until at least 2011.  From 2011 to 2013, Salle has been a director at Tactical Yacht, Ltd. with Luke Hillier and R. Scott LaRose.

277.    Salle has also acted as the registered agent for a number of other ADS, Inc. affiliates, including Hillier Rockefeller Investments, LLC, Core Fitness Obsession, Inc., and Tidewater Pilot Operations, LLC.

### B.    THE ADS AFFILIATED DEFENDANTS INTENTIONALLY MISREPRESENTED THEIR SIZE STATUS

278.    The ADS Affiliated Defendants are clearly very aware of the risk posed by it no longer meeting the size standard requirements under SBA set-aside contracts.  For example, the ADS Tactical S-1 filed with the SEC on February 2, 2011 (and revised on April 28, 2011), it disclosed the following concerning the potential that it might not longer qualify as a small business for certain of its SBA contracts:  "Our failure to comply with a variety of complex procurement rules and regulations could . . . result in our being liable for penalties, including termination of our U.S. Government contracts, disqualification from bidding on future U.S. Government contracts, suspension or debarment from U.S. Government contracting."

279.    Among the laws and regulations ADS Tactical admitted it must comply with are "laws and regulations relating to the formation, administration and performance of U.S. Government contracts, which affect how we do business with our customers and may impose added costs on our business."  The S-1 acknowledged that numerous laws and regulations affect its business including (a) the Federal Acquisition Regulation, or "FAR," and supplements, "which regulate the formation, administration and performance of U.S. Government contracts"; (b) the Civil False Claims Act, "which provides for substantial civil penalties for violations, including for submission of a false or fraudulent claim to the U.S. Government for payment or approval"; and (c) SBA size status regulations, "which regulate eligibility for performance of Government contracts which are set-aside for, or a preference is

given in the evaluation process if awarded to, specific types of contractors such as small businesses and minority-owned businesses."

280.    In addition, ADS Tactical disclosed that "[h]istorically, we have been classified as a small business as determined by the regulations of the SBA.  Such status, generally based on the combined revenues or number of employees of the contractor and its 'affiliates' (as that term is defined by SBA regulations), has enabled us to compete for Federal contracts which are set aside for small businesses, and a significant percentage of our revenue is generated under contracts awarded to us as a result of our status as a small business."  Even though ADS believed it "currently [met] the applicable standard for certain small business contracts, if we or our affiliates increase the number of our respective employees," it acknowledged "we may not be able to pursue future small business contracts, we could lose eligibility for new Government contracts and other awards that are set aside for small businesses.  In addition, we may lose sales from existing contracts."

281.    Specifically, ADS Tactical admitted that, if it had failed to qualify as a small business under SBA set-aside contracts, it could become "ineligible to compete for orders under our Spec Ops TLS contract, which accounted for approximately 41 percent and 45 percent of our total net sales for the year ended December 31, 2009 and the nine months ended September 30, 2010, and some orders under our multiple-award IDIQ contracts."

282.    The size certifications made by the ADS Affiliated Defendants, which are mandatory for SBA participation, expressly create a continuing duty to comply with the conditions of participation in and payment by the Government.  Prior to signing and certifying their small business size, the ADS Affiliated Defendants were advised of the criminal, civil, and administrative penalties misrepresenting their size status.  Among those penalties are criminal

sanctions for fraud, concealment and any trick, scheme or device or scheme to defraud, any false or fraudulent statement or representation or any false writing or document, violations of the FCA, civil penalties for billing for them item or services that the firm knows or should know was not provided as claimed.

283.    In addition to the certifications and recertifications the ADS Affiliated Defendants made with regard to each contract, when they submitted electronic payment invoices to the Government, they did so subject to and under the terms of their certifications and recertifications to the United States that they had met the small business status requirements for each procurement contract.

284.    As a result of the ADS Affiliated Defendants' misconduct, all of their payment invoices submitted after such false certifications were executed constituted false claims that the Government should not and would not have paid.

285.    As a result of the ADS Affiliated Defendants' false and/or fraudulent representations and conduct in securing small business set-aside contracts, and the Government's reliance thereon, the Government was falsely and/or fraudulently induced to enter into and accept contract and terms and conditions to which it would not have agreed had it known the truth. Because the Government was falsely and/or fraudulently induced to approve the small business set-aside contracts with the ADS Affiliated Defendants, each claim for payment under set-aside contracts was a false and/or fraudulent claim. The claims submitted and caused to be submitted by ADS were also false and/or fraudulent because the ADS Affiliated Defendants knowingly failed to abide by their obligations under the law.

## VI.   THE ADS AFFILIATED DEFENDANTS SUBMITTED FALSE CLAIMS THROUGH THEIR VIOLATION OF THE NON-MANUFACTURER RULE

286.   In addition to its violation of the SBA size standards, the ADS Affiliated Defendants have committed widespread violations of the non-manufacturer rule.

287.   Under the non-manufacturer rule, the ADS Affiliated Defendants were restricted from reselling to the government under a small business set-aside contract anything but the products of another small business (i.e., an employer with fewer than 500 employees). *See* 13 C.F.R. § 121.406(b)(1)(i).

288.    Importantly, the size standard threshold for a small business non-manufacturer is not based on a dollar amount, but instead on the number of employees.

289.   Numerous of the companies whose products the ADS Affiliated Defendants sell to the Government are large employers having far more than the 500 employees allowed under the non-manufacturer rule:

- the ADS Affiliated Defendants sold $2,374,880.00 of ABB products to the Government under small business set-aside contracts.  At all times material hereto, ABB (a global leader in power and automation technologies based in Zurich, Switzerland) has employed approximately 150,000 people and operates in approximately 100 countries;

- the ADS Affiliated Defendants sold $103,168,198.12 of Oasys Technology, LLC / BAE Systems products to the Government under small business set-aside contracts.  At all times material hereto, Oasys Technology, LLC/BAE Systems has employed approximately 88,000 employees worldwide;

- the ADS Affiliated Defendants sold $1,981,688.86 of DRS Technologies, Inc./Finmeccanica products to the Government under small business set-aside contracts.

At all times material hereto, DRS Technologies, Inc./Finmeccanica had approximately 70,000 employees worldwide;

- the ADS Affiliated Defendants sold $117,456,160.00 of Vectronix Inc./Vectronix AG products to the Government under small business set-aside contracts.  Vectronix Inc./Vectronix AG is a subsidiary of Safran, SA.  At all times material hereto, Safran, SA had approximately 53,000 employees;

- the ADS Affiliated Defendants sold $26,189,342.57 of Harris Corporation products to the Government under small business set-aside contracts.  At all times material hereto, Harris Corporation had over 6,000 employees in Florida alone;

- the ADS Affiliated Defendants sold $8,864,066.65 of FLIR Systems, Inc. products to the Government under small business set-aside contracts.  At all times material hereto, FLIR Systems, Inc. had approximately 3,000 employees worldwide;

- the ADS Affiliated Defendants sold $104,935.00 of Mansfield Plumbing Products/ CORONA products to the Government under small business set-aside contracts.  At all times material hereto, Mansfield Plumbing Products/CORONA has had approximately 12,500 employees worldwide;

- the ADS Affiliated Defendants sold $468,148.04 of Caterpillar, Inc. products to the Government under small business set-aside contracts.  At all times material hereto, Caterpillar, Inc. has had over 132,000 employees;

- the ADS Affiliated Defendants sold $1,116,747.28 of Multiquip, Inc. products to the Government under small business set-aside contracts.  At all times material hereto, Multiquip, Inc. had approximately 700 employees;

- the ADS Affiliated Defendants sold $20,264.00 of Goodman Manufacturing/Daikin Industries products to the Government under small business set-aside contracts. At all times material hereto, Goodman Manufacturing/Daikin Industries had over 49,000 employees worldwide;

- the ADS Affiliated Defendants sold $149,340.24 of Honeywell International products to the Government under small business set-aside contracts. At all times material hereto, Honeywell International had over 122,000 employees in over 100 countries; and

- the ADS Affiliated Defendants sold $149,104.24 of Arc'teryx products to the Government under small business set-aside contracts. At all times material hereto, Arc'teryx has had approximately 6,300 employees.

290.    As a direct, proximate and foreseeable result of the ADS Affiliated Defendants' fraudulent failure to comply with the non-manufacturer rule and conducted on a national scale, from at least 2007 through at least April 2014 Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of thousands of false or fraudulent statements and false claims to Government programs for payment for their products.

291.    Moreover, the practices complained of herein are continuing.

## VII.  THE ADS AFFILIATED DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES

292.    As alleged in this Second Amended Complaint, one facet of the ADS Affiliated Defendants' scheme involved one or more plans with other entities to further the overall fraudulent representations of the ADS Affiliated Defendants' size through a pattern and practice of false and misleading representations ("overt acts").

293.   As alleged in this Second Amended Complaint, the ADS Affiliated Defendants' executives and sales managers directed their sales forces to gain the agreement of these entities to conceal the affiliation with the ADS Affiliated Defendants.

294.   The overt acts included the submission to Government Programs by these affiliated entities of knowingly false certifications of compliance with laws that are conditions of Government Program payments (which certifications were false at the time the certifications were made). As a result of these false certifications, Government Programs made payments to Defendants under small business set-aside contracts that Defendants were ineligible to receive. Besides Defendants, the Co-Conspirators include numerous other related entities through which the ADS Affiliated Defendants have conducted their fraudulent scheme.

295.   H.E. Management Services, LLC is a Virginia limited liability company registered on May 21, 2012 with a principal office at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia 23452.   This address is also the principal place of business as Defendant ADS, Inc.  The company's registered agent is Farhad Aghdami, a tax lawyer with the firm of Williams Mullen in Richmond, Virginia.   Since 2012, H.E. Management Services has employed a Director of Flight Operations and several crew members involved in the management and operation of a Gulfstream IV aircraft.   Upon information and belief, this Gulfstream is registered to Hillier GIV, LLC, of Virginia Beach.

296.   H.E. PE1, LLC is a Virginia limited liability company registered on September 5, 2013 with a principal place of business at 621 Lynnhaven Parkway, Suite. 400, Virginia Beach, Virginia 23452.   This principal place of business is also the principal place of business of Defendant ADS, Inc.  HE. PE1's registered agent is Farhad Aghdami, a tax lawyer with the firm

of Williams Mullen in Richmond, Virginia who also acts as the registered agent for co-conspirator H.E. Management Services, LLC.

297.    Hillier GIV, LLC is a Virginia limited liability company registered on May 10, 2012 with a principal place of business at 621 Lynnhaven Parkway, Suite. 400, Virginia Beach, Virginia 23452.  This address is also the principal place of business of Defendant ADS, Inc.  Hillier GIV's registered agent is Farhad Aghdami, a tax lawyer with the firm of Williams Mullen in Richmond, Virginia who also acts as the registered agent for co-conspirators H.E. Management Services, LLC and H.E. PE1, LLC. Hillier GIV owns a twenty-two seat 1992 Gulfstream Aerospace G-IV.  Comparable aircraft currently retail for approximately $7 million.

298.    Incredible Supply, LLC (a/k/a Incredible Supply and Logistics, or "ISL") is a limited liability company formed on January 21, 2009.  Its principal place of business is located at 47141 Kentwell Place in Sterling, Virginia 20165.  ISL's registered agent is Christopher Richards.  ISL is a certified small business and a GSA Schedule contractor (Contract #: GS-21F-0025Y) that offers a full range of logistics and product distribution services for the Federal, Defense, Intelligence, State & Local Government and Maritime communities.  The company represents in its SAM registration that it employs only 10 people.  ISL's revenue has grown rapidly since its founding in 2009, jumping from $2.5 million in 2011 to $6 million in 2012.  ISL anticipates generating $12 million in revenue in 2013.  Since FY 2010, ISL has received approximately $3.3 million from U.S. Government agencies.  Of this, ISL received $708,546 from the U.S. Government and its agencies under small business set-aside contracts.  In fact, ISL has almost doubled its small business set-aside contracts since the beginning of 2014.  Currently, ISL's headquarters is located at 2204 Poplar Point Road in Virginia Beach, Virginia, which is directly adjacent to LDC Adventure Outfitters—the dive shop owned by the Hillier family.  The

ISL facility is also located diagonally across from the headquarters of ADS Affiliated Defendant Mythics, Inc.  ISL has an additional U.S. Federal & Defense office at 8219 Leesburg Pike, Suite 320, Vienna, Virginia 22182.  This is the same address listed for Mythics' U.S. Federal Government office.  Furthermore, ISL previously has listed its place of business on a Government contract at 1439 North Great Neck Road, Suite 201, Virginia Beach, Virginia 23454.  This address is also the current address of Mythics' headquarters as well as the headquarters of ADS Affiliated Defendants IronBrick Ltd. and Iron Brick Associates, LLC.  This address was also a previous place of business of ADS, Inc.  ISL's website also lists ADS as a customer/partner.  ISL has managerial ties to Mythics and ADS Affiliated Defendant Emergent LLC.  For example, ISL co-founder and investor/shareholder Christopher Richards is currently the Vice President of Marketing and Customer Service at Mythics and Emergent.  Based on their common management and shared addresses, ISL is affiliated with the ADS Affiliated Defendants under SBA rules and regulations.  Taken together, the combined total of affiliated employees for ISL is at least 900 employees, thus making ISL ineligible to bid on set-aside contracts for small businesses.

299.    Karda Systems LLC ("Karda") is a Virginia limited liability company with its principal place of business at 2513 Reagan Ave, Virginia Beach, Virginia 23454.  Karda is a certified SBA 8(a) business.  Between FY 2008 and FY 2014, Karda received a total of $23,905,746.90 from U.S. Government agencies.  Of this, it received $20,606,688.75 from the U.S. Government and its agencies under small business set-aside contracts.  Karda has ties to ADS, ADS Affiliated Defendant SEK Solutions, and to London Bridge Trading Company, Ltd. ("LBT").  For example, Karda sells ADS products.  Karda's registered agent is Samuel M. Caragan, who is related to SEK Solutions Executive Vice President/Owner Ron Villanueva by

marriage (Villanueva's wife is Catherine Caragan Villanueva).   The address listed on Karda's Virginia state business registration (2513 Reagan Ave, Virginia Beach, Virginia 23454) is a residence that has belonged to Caragan since 2007.   Karda's website lists a retail address at 585 London Bridge Road, Virginia Beach, Virginia 23454, which is the same business address belonging to LBT.

300.   London Bridge Trading Company, Ltd. ("LBT") is a Virginia limited company with its principal place of business at 585 London Bridge Road, Virginia Beach, Virginia 23454. Its previous place of business from 1998 to 2007 was 3509 Virginia Beach Boulevard, Virginia Beach 32452.   Between FY 2008 and FY 2013, LBT received a total of $2,989,127.06 from U.S. Government agencies.   Of this, LBT received $288,220.69 from the U.S. Government and its agencies under small business set-aside contracts.   Since at least 1995, Harold ("Doug") McDougal has served as LBT's Chief Executive Officer.   Other members of LBT's executive management include President David M. Bohannon and Chief Financial Officer Kevin P. Moran. Between 2000 and 2011, LBT experienced rapid growth, increasing the number of employees from 42 in 2000 to approximately 500 employees in 2011.   Yet on its SAM registration, LBT continues to certify to the Government that it employs only 218 people.   LBT and ADS have provided mutual promotional services for each other.   LBT's 2011 tactical catalogue contains a page featuring and advertisements for its "premier provider": ADS, Inc.   ADS has similarly devoted considerable resources to promoting LBT's products.   LBT is featured on ADS' website, Facebook page, and YouTube Channel.   ADS also produced a 2013 video promoting LBT. *See* https://www.youtube.com/watch?v=AWa5UFtFb8M (last visited June 16, 2015).   The email address of LBT's President David Bohannon (dbohannon@londonbridgetrading.com) has also been listed as a contact on the SAM registration of ADS Co-Conspirator Tactical Distributors.

Tactical Distributors, like ADS, sells LBT products through its website.  LBT itself has several affiliates.  For example, Lion Claw Tactical, Ltd. ("LCT") is a subsidiary company formed on February 7, 2006.  LCT has a principal office located at: PO Box 15276, Chesapeake, Virginia 23328.  Its registered agent is Alan M. Frieden, an attorney at Virginia Beach law firm Faggert & Frieden, P.C.  LCT is the training division of LBT.  In addition, London Bridge Holding LLC is a limited liability company formed on February 28, 2003 with its principal place of business at 3509 Virginia Beach Boulevard, Virginia Beach, Virginia 23452.  Its registered agent is Charles M. Salle, who is also the Vice President and General Counsel at ADS.  Taken together, the combined total of affiliated employees for LBT is at least 1,000 employees, thus making LBT ineligible to bid on set-aside contracts for small businesses.

301.    Lynnhaven Dive Center, LLC (d/b/a LDC Adventure Outfitters) ("LDC") is a Virginia limited liability company with its principal place of business at 1413 Great Neck Road, Virginia Beach, Virginia 23454, which is the same principal place of business as Defendant Mythics.  Lynnhaven Dive Center is a family-owned and operated establishment that has been in business since 1979.  The company recently changed its name to LDC Adventure Outfitters.  LDC describes itself as "one of the largest scuba diving establishments on the east coast. We have the absolute best selection of quality diving equipment available."  At all times material hereto, Lynnhaven Dive Center has had at least 16 full and part-time employees.

302.    Tactical Air, LLC ("Tactical Air") is a Virginia limited liability company formed on March 13, 2007 with its principal place of business at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452.  This address was the same principal place of business as Defendant ADS, Inc. at the time of the registration. Tactical Air's registered agent is ADS CEO Luke Hillier.  ADS and Mythics are the only entities that lease aircraft from Tactical Air.  These

aircraft have included a Bombardier Challenger 601, a Learjet 55, a Hawker 800, and a Gulfstream IV-SP. In 2007 and 2008, each of Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose owned 33 percent of Tactical Air. From 2009 on, Tactical Air has been owned 50 percent by Luke Hillier and 50 percent by R. Scott LaRose.

303.    Tactical Distributors, LLC ("Tactical Distributors") is a Virginia limited liability company formed on June 22, 2006 with a principal place of business of 476 Viking Dr., Suite 101, Virginia Beach, Virginia 23452. This address is the same as Defendant SEK Solutions. Upon formation, Tactical Distributors' principal place of business was 477 Viking Dr, Suite 350, Virginia Beach, Virginia 23452, which was also the principal place of business of Defendant ADS, Inc. at the time. On its website, Tactical Distributors has also listed a place of business as 621 Lynnhaven Parkway, Suite 310, Virginia Beach, Virginia 23452, which is the same address as ADS Tactical's current principal place of business. Tactical Distributor's registered agent is Luke Hillier, the CEO of ADS Tactical and ADS, Inc. Tactical Distributors is an online wholesale distributor of tactical and operational equipment that sells primarily to non-Government customers, including small resellers and individuals making purchases for recreational use. It bills itself as "the largest tactical ecommerce site in the world." ADS sold its products to Tactical Distributors, which then resells these products to its customers. In addition, ADS purchased some of the products that it sells to its Government customers from Tactical Distributors. The owners of ADS (Hillier, Clarkson, LaRose) set up Tactical Distributors to transact sales to non-Government customers. Upon information and belief, until 2010 ADS staff has assisted with the accounting and bookkeeping of Tactical Distributors in exchange for a nominal monthly fee of $1,000. In 2007 and 2008, Tactical Distributors was owned by Daniel Clarkson, Luke Hillier, Michael Hillier, Jr. (Luke Hillier's brother) and R. Scott LaRose, in the

amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively. From 2009 on, Tactical Distributors has been owned by Daniel Clarkson, Luke Hillier and R. Scott LaRose in the amounts of 16.64 percent, 58.4 percent and 24.96 percent, respectively. Tactical Distributors employs a number of employees including web content managers, technology analysts, an e-commerce director, sales managers, SEO managers, and customer service managers. Currently at least E-Commerce Technologies Analyst Timothy Sisson and E-Commerce Director Todd Askins hold the same positions at both Tactical Distributors and Defendant ADS, Inc.

304. Tactical Exporters, Inc. ("Tactical Exporters") is a Delaware corporation incorporated on September 4, 2008. In 2008, Tactical Exporters was owned by Daniel Clarkson, Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose in the amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively. From 2009 on, Tactical Exporters was owned by Daniel Clarkson, Luke Hillier, and R. Scott LaRose in the amounts of 16.64 percent, 58.4 percent and 24.96 percent, respectively. ADS has at all times material hereto utilized the services of Tactical Exporters in connection with the sale of the products and related services outside of the United States.

305. Tactical Hawker, LLC ("Tactical Hawker") is a Virginia limited liability company formed on September 4, 2008 with a principal office at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452. This address is the same principal place of business as Defendant ADS, Inc. at that time. Tactical Hawker's registered agent is Luke Hiller, the CEO of ADS, Inc. ADS and Mythics lease an aircraft from Tactical Hawker, LLC, or "Tactical Hawker." Among the aircraft registered to Tactical Hawker is a Hawker Beechcraft 850XP N3400S. In 2008, Tactical Hawker was owned by Daniel Clarkson, Luke Hillier, Michael

Hillier, Jr. and R. Scott LaRose in the amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively. From 2009 on, Tactical Hawker has been owned by Daniel Clarkson, Luke Hillier and R. Scott LaRose in the amounts of 16.64 percent, 58.4 percent and 24.96 percent, respectively.

306.    Tactical Holdings, LLC ("Tactical Holdings") is a Virginia limited liability company formed on April 28, 2006 with a principal office at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452.  This address was the same principal place of business as Defendant ADS, Inc. at the time.  Tactical Holdings' registered agent is Luke Hillier, CEO of ADS. Tactical Holdings is a company formed to be co-owner of Blauer Tactical Systems. In 2007, Tactical Holdings was owned by Daniel Clarkson, Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose in the amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively. From 2008 on, Tactical Holdings has been owned 100 percent by Charles Salle, the ADS General Counsel. Blauer Tactical Systems ceased operations in February 2010 by agreement of dissolution.

307.    Tactical Office, LLC ("Tactical Office") is a Virginia limited liability company formed on January 15, 2009 with a principal place of business at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452.  This address was also the principal place of business of Defendant ADS, Inc. at the time.  Tactical Office's registered agent is Luke Hillier, the CEO of ADS.  Tactical Office owns the office building and property used as ADS Inc's headquarters at 621 Lynnhaven Parkway, Virginia Beach, Virginia.  The property is worth approximately $7 million, and was purchased in February 2009.  In the fourth quarter of 2009, ADS entered into a lease for office space in its corporate headquarters with Tactical Office, which owns and operates the office building that contains the corporate headquarters as well as the offices of several

80

additional tenants located in the same building.  ADS also guarantees Tactical Office debt in the amount of $6.2 million incurred to purchase the building. From 2009 to present, Tactical Office has been owned by Daniel Clarkson, Luke Hillier and R. Scott LaRose in the amounts of 16.64 percent, 58.4 percent and 24.96 percent, respectively.

308.    Tactical Pilot Operations, LLC ("Tactical Pilot") is a Virginia limited liability company formed on March 13, 2007 with a principal place of business at 477 Viking Dr., Suite 350, Virginia Beach, Virginia 23452.  This address was also the principal place of business of Defendant ADS, Inc. at the time.  Tactical Pilot's registered agent is Luke Hillier, CEO of ADS. ADS purchases pilot services for chartered aircraft from Tactical Pilot, which entity employs the pilots that operate the planes held by Tactical Air and Tactical Hawker and provides maintenance and other operational services in connection with these planes. Tactical Pilot provides services only to ADS and to Mythics. In 2007 and 2008, each of Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose owned 33 percent of Tactical Pilot. From 2009 to the date of this prospectus, each of Luke Hillier and R. Scott LaRose have owned 50 percent of Tactical Pilot.

309.    Tactical Properties, LLC ("Tactical Properties") is a Virginia limited liability company registered on May 10, 2004 with a principal place of business at 1439 N. Great Neck Rd., Virginia Beach, Virginia 23454.  This address was the principal place of business of Defendant ADS, Inc. at the time.  Tactical Properties' registered agent is Charles Salle, the Vice President and General Counsel of ADS.  Tactical Properties owns a property at 3180 Silver Sands Circle, Virginia Beach, Virginia and another at 4212 Tranquility Drive, Boca Raton, Florida 33487 worth approximately $2 million.  ADS has leased two homes from Tactical Properties.  For each of the years ended December 31, 2007, 2008 and 2009, ADS paid rent and other fees in connection with property management services to Tactical Properties in the amount

of $180,000. Each of Daniel Clarkson, Luke Hillier, Michael Hillier, Sr., Michael Hillier, Jr., R. Scott LaRose and Charles Salle own 16.66 percent of Tactical Properties. Michael Hillier, Sr. is the father of Luke Hillier.

310. Tactical Yacht, LTD. (used in Virginia by Redemption, LTD) ("Tactical Yacht") is a foreign corporation registered on September 13, 2010 with a principal place of business at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia 23452. This address is also Defendant ADS, Inc.'s principal place of business. Tactical Yacht's registered agent is Charles Salle, the Vice President and General Counsel of ADS. Since 2011, Luke Hillier has acted as an officer and director of Tactical Yacht, and R. Scott LaRose and Charles Salle have acted as directors.

311. Tactical Warehouse, LLC ("Tactical Warehouse") is a Virginia limited liability company formed on April 14, 2008 with a principal place of business at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia. This address is also the principal place of business of Defendant ADS, Inc. Tactical Warehouse's registered agent is Charles Salle, the Vice President and General Counsel of ADS. In July 2008, Tactical Warehouse purchased three Virginia Beach, Virginia properties: a 266,151 square foot property at 2505 Aviator Drive for approximately $6.4 million; a 186,611 square foot plot of land at 2512 Aviator Drive for approximately $1 million; and a 59,415 square foot plot of land 2520 Aviator Drive for approximately $1 million. ADS leases its kitting facility from Tactical Warehouse, which owns the building that houses the ADS kitting facility. ADS also guarantees debt in the amount of $6.6 million incurred by Tactical Warehouse to purchase the building. In 2008, Tactical Warehouse was owned by Daniel Clarkson, Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose in the amounts of 16.64 percent, 50.08 percent, 16.64 percent and 16.64 percent, respectively. From

2009 on, Tactical Warehouse has been owned by Daniel Clarkson, Luke Hillier and R. Scott LaRose in the amounts of 16.64 percent, 58.4 percent and 24.96 percent, respectively.

312.   Tidewater Pilot Operations, LLC ("Tidewater Pilot") is a Virginia limited liability company formed on June 28, 2011 with a principal office at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia.  This address is also the principal place of business of Defendant ADS, Inc. Tidewater Pilot's registered agent is Charles Salle, the Vice President and General Counsel of ADS, Inc.

313.   Warrior Protection & Readiness Coalition ("WPRC") (f/k/a Warrior Protection and Readiness Association) is a Virginia lobbyist organization formed in 2009 with a principal place of business at 477 Viking Dr., Suite. 350, Virginia Beach, Virginia.  WPRC's registered agent is Charles Salle, the Vice President and General Counsel of Defendant ADS, Inc.  The Warrior Protection and Readiness Association ("WPRA") was also formed in 2009 with a principal place of business at 621 Lynnhaven Parkway, Suite 400, Virginia Beach, Virginia 23452.  Its registered agent is Evans McMillion, who is ADS' Assistant General Counsel. WPRC is a non-profit coalition of tactical manufacturers contracting with the Department of Defense ("DOD").  Between 2009 and 2013, WPRC has spent approximately $780,000 on special interest lobbying for its military equipment manufacturer industry.

314.   The ADS Affiliated Defendants and its co-conspirators shared in the conspiratorial objective to deceive the United States concerning the number of employees they had, their profit, and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of ADS and the affiliated entities' scheme to target and financially injure Government Programs.  Accordingly, the ADS Affiliated Defendants and the co-conspirators entered into these unlawful financial relationships for the purpose of Defendants'

planned scheme to target Government Programs and submit or cause the submission of false or fraudulent claims and records.

315.    As described in this Second Amended Complaint, Defendants intentionally conspired with one or more of these affiliated entities to get a false or fraudulent claims allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

316.    Through the acts and omissions described in this Second Amended Complaint, and from on or before at least January 2007 to the present, Defendants, with each other and with affiliated entities known and unknown, knowingly agreed and conspired to defraud the Government by having false or fraudulent statements, records, certifications, and invoices submitted to, paid and approved by Government officials, their contractors, intermediaries and/or their agents.

317.    By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, including size status certifications to Government, causing the United States to suffer significant damages.

318.    The United States is therefore entitled to recover from Defendants treble damages under the Federal FCA, in an amount to be proved at trial, plus a civil penalty of at least $5,500 for each violation.

## VIII. ADS' PAYMENTS OF BRIBES TO A GOVERNMENT CONTRACTING OFFICER TO SECURE A FEDERAL PRIME VENDOR CONTRACT CAUSED THE SUBMISSION OF FALSE CLAIMS

319.    In 2008 ADS submitted a proposal in response to Solicitation No. SPM8EJ-08-R-0051, which pertained to a set-aside contract for small businesses.  On January 12, 2009, the

Defense Logistics Agency's Defense Supply Center Philadelphia ("DSCP") awarded ADS and three other companies a $487,799,322 firm fixed price contract under the Special Operational Equipment Tailored Logistics Support Program (the "TLS Program"), a follow-on to the Special Operations Equipment Prime Vendor program.  The contract award number was SPM8EJ-09-D-0003.  The contract was for two years with three yearly options.  The agencies listed for this contract include the Army, Navy, Air Force, Marine Corps, and other Federal civilian agencies.

320.    Proposals for the TLS Program contract were originally web-solicited with 14 responses. In addition to ADS, the other winners selected were Tactical & Survival Specialties, Inc. (Harrisonburg, VA), W.S. Darley & Co. (Itasca, IL), and Source One Distributors, Inc. (Wellington, FL).

321.    The DSCP is located at 700 Robbins Avenue in Philadelphia, Pennsylvania 19111-5096.  The DSCP point of contact for the management of the Prime Vendor and TLS Program contracts was Cynthia L. Skrocki, a Government Contracting Officer.

322.    On information and belief, ADS used unlawful means to develop a very close (and highly improper) relationship with Contracting Officer Skrocki.  As part of its scheme, ADS paid or agreed to pay Skrocki a "consulting fee" in excess of $100,000 in order to secure Skrocki's favorable treatment of ADS' bids, including ADS' winning bids on the TLS Program and Prime Vendor contract vehicles and subsequent quotes.  In exchange for these payments, Skrocki kept ADS apprised of contractor bid or proposal information submitted by ADS' competitors, providing ADS with the precise bid amounts of all the other bidders.  This information provided ADS with the ability to secure contracts with bids designed to narrowly undercut those of their competitors.

323.   In addition, on information and belief, Skrocki alerted ADS to the existence of specific contracting opportunities before those same opportunities were made public.  In essence, Skrocki provided ADS with a head start on certain contracts, which allowed ADS time to both secure favorable pricing from its vendors and then to submit bids on these contracts before its competitors were ever made aware of the opportunities.

324.   ADS used affirmative acts to obtain contractor bid information, proposal information, and/or source selection information in violation of the Procurement Integrity Act and the FAR.  *See* 41 U.S.C. § 2102 (b) (prohibiting receipt of contractor bid or proposal information or source selection information until a contract is awarded); FAR § 3.104-3(b) ("No person shall knowingly obtain such information before the award of the contract to which the information relates.").

325.   As a result of ADS' false and/or fraudulent representations and conduct in securing the orders under the TLS Program contract, and the Government's reliance thereon, the Government was falsely and/or fraudulently induced to enter into and accept contract and terms and conditions to which it would not have agreed had it known the truth. Because the Government was falsely and/or fraudulently induced to approve contracts under the TLS Program contract with ADS, these contracts were void *ab initio* and each claim for payment was a false and/or fraudulent claim. The claims submitted and caused to be submitted by ADS were also false and/or fraudulent because ADS knowingly failed to abide by its conflict of interest obligations and knowingly failed to disclose its conflicts of interest arising out of its relationship with Skrocki.

## IX. ADS USED INSIDE INFORMATION FROM GOVERNMENT CONTRACTING OFFICIALS TO ENSURE WINNING BIDS UNDER THE PRIME VENDOR CONTRACT

326.    ADS illegally used inside information—provided by a government contracting officer—to secure improper advantages under the Special Operations Equipment Prime Vendor Program ("PV Contract").

327.    In or around May or June of 2008, Andy McNabb, then an ADS sales representative who was working on the ADS team responsible for responding to government requests for bids under the PV Contract (later renamed the "TLS Program"), received telephone calls from a government contracting officer working on the PV Contract. This government contracting officer would receive competitors' bids shortly before the bid deadlines.   The contracting officer would then, on certain targeted deals, communicate the competitors' pricing directly to ADS, informing McNabb of the price that ADS would need to come in at in order to win the bid under the PV Contract.  This information enabled ADS to adjust its bid price in order to win the award.

328.    McNabb maintained a document on his work computer that showed the breakdown of the awards ADS had secured under the PV Contract.  Specifically, the breakdown was reflected in a color pie chart, which showed that ADS had been awarded at least 80% of all orders under the PV Contract. By virtue of receiving inside information from the government contracting officer, ADS could decide which proposals it wanted and which ones it was willing to give up.  ADS forwent just enough bids so as avoid "winning" them all and raising any red flags with its competitors or others.

329.    In sum, ADS participated in an illegal scheme, in collusion with a government contracting official, that was intended to allow ADS to selectively secure bids under the PV

Contract. The scheme's success came as the direct result of the inside information provided by the government official.

330.     ADS' solicitation and receipt of inside information constitutes a violation of both the criminal Procurement Integrity Act, 41 U.S.C. § 423(a)(3), as well as the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 3.104-3(b), both of which prohibit government contractors from *receiving* procurement-sensitive bid information.   Additionally, both the Procurement Integrity Act and the FAR prohibit government officials from *providing* such information. *See* 41 U.S.C. § 423(b)(3) and 48 C.F.R. § 3.104-4.

## X.     ADS ENGAGED IN ILLEGAL BID RIGGING

331.     ADS' illegal conduct also includes bid rigging.   Specifically, ADS engaged in secret discussions with Mar-Vel International, Inc. ("Mar-Vel")—one of the other contractors under the PV Contract—to manipulate bids in response to government requests under that contract.

332.     In or around May of 2008, ADS was planning on developing its own shipping operations.   The planned expansion was a step toward ADS' goal of becoming the "Wal-Mart of government contracting."   ADS was also at the time in the process of acquiring a number of companies, including at least one of its competitors.

333.     ADS had previously found itself in direct competition with Mar-Vel on several contracts.   Having lost to Mar-Vel on a number of occasions, including under the PV Contract, ADS elected to purchase Mar-Vel rather than compete against it.   And in September of 2008, ADS acquired Mar-Vel for a reported $5 million.

334.     However, at least five months *before* the acquisition, ADS and Mar-Vel had already conspired to work together to ensure that one or the other would win particular orders under the PV Contract.   According to Troy Clifton, ADS' Director of Community Relations, the

agreement provided that ADS and Mar-Vel would agree to bid a certain way—e.g., bidding high, bidding low or not bidding at all—on requests for proposals under the PV Contract.  The agreement was designed to guarantee that at least one of the two companies would ultimately secure the bid.

335.    The agreement between ADS and Mar-Vel constitutes bid rigging, which is a felony criminal offense under Section 1 of the Sherman Act.  *See* 15 U.S.C. § 1.  According to the Department of Justice, bid rigging "is the way that conspiring competitors effectively raise prices where purchasers—often federal, state, or local governments—acquire goods or services by soliciting competing bids," and occurs when "competitors agree in advance who will submit the winning bid on a contract being let through the competitive bidding process."  *See* DOJ Guidelines, *Price Fixing, Bid Rigging, And Market Allocation Schemes: What They Are And What To Look For* ("DOJ Guidelines"), *available at* http://www.justice.gov/atr/public /guidelines/211578.pdf (last visited Feb. 28, 2014).

336.    Of the four basic schemes identified by the Department of Justice in most bid-rigging conspiracies, ADS' agreement with Mar-Vel implicates at least two schemes, including bid suppression and complementary bidding.  *See* DOJ Guidelines, at 2.  First, the Department of Justice defines "bid suppression" as follows: "one or more competitors who otherwise would be expected to bid, or who have previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the designated winning competitor's bid will be accepted."  *Id*. In this case, ADS and Mar-Vel's arrangement, whereby one company purposefully refrains from submitting a bid in an effort to allow the other to prevail, qualifies as bid suppression.

337.    Second, the Department of Justice defines "complementary bidding" as occurring "when some competitors agree to submit bids that either are too high to be accepted or contain

special terms that will not be acceptable to the buyer." *See* DOJ Guidelines, at 2. Complementary bidding also occurs when "[s]uch bids are not intended to secure the buyer's acceptance, but are merely designed to give the appearance of genuine competitive bidding." *Id*. According to the Department of Justice, under complementary bidding, co-conspirators submit token bids that are intentionally high or that intentionally fail to meet all of the bid requirements in order to lose a contract.  Here, ADS and Mar-Vel engaged in complementary bidding when they agreed that one company would purposefully submit bids of a quality, i.e., too high or too low, that ensured the other company's bids under the PV Contract would be accepted.

338.    The agreement between ADS and Mar-Vel also runs afoul of the FAR. Specifically, section 52.203-2, entitled Certificate of Independent Price Determination, requires firms to certify that they have arrived at their prices independently, that they have not disclosed their prices to other competitors, and that they have not attempted to induce another firm to submit or refrain from submitting a bid for the purpose of restricting competition. *See* FAR § 52.203–2.

339.    By agreeing to submit bids in a collusive manner, ADS and Mar-Vel intentionally deprived the Government of the benefits of free and open competition.  And each time ADS submitted a bid, or caused Mar-Vel to submit a bid, in violation of the certification requirements of section 52.203-2, it caused a false claim to be submitted for payment to the federal Government.

## XI.    THE ADS AFFILIATED DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

340.    Businesses seeking to do business with the Government must complete and sign a FAR Report that contains representations and certifications relating to the businesses' eligibility

to participate in certain Government programs.  This FAR Report, which is ultimately submitted

in the System for Award Management ("SAM") database, contains the following averment:

> I have read each of the FAR and DFARS provisions presented below. By submitting this certification, I, [company representative], am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent [the company] in any of the below representations or certifications to the Government.

341.    In addition to the above certifications, contractors doing business with the

Government certify, either expressly or impliedly, their eligibility to bid on set-aside contracts

for small businesses each time they submit invoices for payment.

342.    For example, contractors (like the ADS Affiliated Defendants) who do business

with the Department of Defense typically submit invoices for payment to the Government using

paper, email (less common) and electronic portals (most common).  One such portal is the Wide

Area Workflow ("WAWF")—a secure web-based system for electronic invoicing, receipt, and

acceptance.    WAWF allows government vendors to submit and track invoices and

receipt/acceptance documents over the web and allows government personnel to process those

invoices in a real-time, paperless environment.

343.    WAWF was established in accordance with the 2001 National Defense

Authorization Act, which *requires* claims for payment under a Department of Defense Contract

to be submitted in electronic form.  DFARS § 252.232.7003.  In fact, as of March 03, 2008,

DOD issued a final rule amending the Defense Federal Acquisition Regulation supplement

("DFARS") to require use of the WAWF as the only acceptable electronic system for submitting

requests for payment (invoices and receiving reports) under DOD contracts.

344.    The process begins when a contractor completes an electronic invoice form,

which requires certain information including the contract number, the contractor's code and the

method for payment.  Also included on the invoice are fields indicating whether the contract is unrestricted or a set-aside acquisition.  If the contract is a set-aside for small businesses, the contractor must check the appropriate box highlighting this fact.

345.   Once the contractor completes the invoice, including certifying that the contract is a small business set-aside, the contractor submits the invoice to the WAWF, where the Government agency begins its review.  Specifically, the invoice is reviewed by (1) a Government "Inspector," (2) a Government "Acceptor," (3) a Local Processing Office, and (4) the Defense Finance and Accounting Services Payment Office.  At each step in the process, the reviewer examines the invoice containing the certification that the contractor is an eligible small business, and then makes a decision to accept or reject the request.  If it is accepted by each reviewer, the Department of Defense Pay Systems ultimately issues an electronic funds transfer to the contractor's account.

346.   The ADS Affiliated Defendants submitted numerous false claims to the Government in the form of invoices on their unlawfully obtained contracts, which impliedly certified that the ADS Affiliated Defendants were legitimate small business concerns when they bid on small business set-aside contracts.

347.   The ADS Affiliated Defendants' fraudulent scheme served its intended purpose, as they induced Government agencies to purchase supplies from the ADS Affiliated Defendants under small business set-aside contracts.  In doing so, the ADS Affiliated Defendants submitted false claims in the form of false certifications, which misrepresented the true size of their businesses and resulted in hundreds of millions of dollars in improper payments by Government Programs.

348.    The ADS Affiliated Defendants' intentional misrepresentations regarding their size as small, which were contained in its certifications submitted to Government Programs, were false within the meaning of the federal False Claims Act.

349.    Claims for payments submitted to Government Programs, in part or in whole, which were the result of the ADS Affiliated Defendants' misrepresentations regarding their size as small, were false within the meaning of the federal False Claims Act.

350.    The ADS Affiliated Defendants' misrepresentations regarding their size as small caused them to be awarded contracts which were void *ab initio* and caused the submission of claims for payment that were false when made.

351.    The ADS Affiliated Defendants' misrepresentations regarding their size as small were made knowingly and with the intent to cause the submission of false claims to Government Programs.

352.    Government Programs paid the ADS Affiliated Defendants under small business set-aside contracts based on Defendants' false claims, and as a result have incurred and continue to incur significant damages due to Defendants' intentional misrepresentations regarding their size as small.

353.    By falsely certifying its eligibility to bid on small business set-aside contracts, and causing subsequent claims for payment to be made that the ADS Affiliated Defendants knew were ineligible for payment by Government Programs, the ADS Affiliated Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described herein.

## XII.  SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS MISREPRESENTATION FRAUD

354.    Firms that misrepresent their small business status to win set-aside contracts create severe harm to the country in a number of respects.  Most apparent, the misrepresentation harms legitimate small businesses because it denies them the opportunity to win contracts.  The ADS Affiliated Defendants have directly harmed hundreds if not thousands of legitimate small businesses who have lost work they were entitled to win but for the unclean hands of the ADS Affiliated Defendants.

355.    Second, at the scale of the ADS Affiliated Defendants' fraud, the misrepresentation distorts the true picture of federal agencies' annual small business spending. This chokes off future dollars for small business in the budgeting process.

356.    Specifically, Federal agencies are required to track and report their annual spending with small business, and are evaluated against negotiated yearly goals. Agencies use the tracking data in the budget and planning process to decide on the dollar level of future work that must be set aside for small business so the goals can be reached.

357.    The ADS Affiliated Defendants' misconduct falsely led agencies to believe that billions of dollars of contract revenue went to small businesses, when in fact those dollars went to the sham network created by the ADS Affiliated Defendants.

358.    But for the misrepresentations, agencies would have realized they were farther behind their goals, and would have set aside far more work for legitimate small businesses. Thus hundreds if not thousands of small businesses were deprived of opportunities.

359.    The sustained misrepresentation also undermines the public's confidence in the integrity of the competitive bidding process and in the small business programs as a whole.

94

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))[1]

360.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

361.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as mended.

362.    Through the acts described above, the ADS Affiliated Defendants and their agents and employees knowingly misrepresented submitted or caused to be submitted to the United States Government knowingly false or fraudulent claims for set-aside small business contracts.

363.    As alleged herein, the ADS Affiliated Defendants' representations to the United States were knowingly false. By engaging in the conduct described herein, the ADS Affiliated Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

364.    Through the acts described above, the ADS Affiliated Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States Government.

365.    The United States, unaware of the falsity of the records, statements and claims made by the ADS Affiliated Defendants, paid the ADS Affiliated Defendants for claims that would otherwise not have been allowed.

366.    By reason of the ADS Affiliated Defendants' false records, statements and claims, the United States Government has been damaged and continues to be damaged in the amount of hundreds of millions of dollars.

_____

[1]  To the extent wrongdoing occurred prior to May 20, 2009, this Second Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(1) (2006).

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))[2]

367.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

368.    As alleged herein, the ADS Affiliated Defendants knowingly made false representations to the United States. The ADS Affiliated Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

369.    Because of the ADS Affiliated Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))[3]

370.    Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

371.    As detailed above, the ADS Affiliated Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). The ADS Affiliated Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

---

[2] To the extent wrongdoing occurred prior to May 20, 2009, this Second Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(2) (2006).

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Second Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(3) (2006).

372.    As a result of ADS Affiliated Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))[4]

373.    Relator incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

374.    As alleged in detail above, the ADS Affiliated Defendants knowingly avoided or decreased their obligation to pay or transmit money to the Government. Specifically, the ADS Affiliated Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

375.    As a result of the ADS Affiliated Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against the ADS Affiliated Defendants as follows:

A.    That the ADS Affiliated Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*;

B.    That judgment be entered in Relator's favor and against the ADS Affiliated Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Second Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(7) (2006).

losses resulting from the various schemes undertaken by the ADS Affiliated Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      C.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

      D.      That the ADS Affiliated Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

      E.      That judgment be granted for Relator against the ADS Affiliated Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

      F.      That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated: July 2, 2015

W. Scott Simmer, D.C. Bar #460726
Andrew M. Miller, D.C. Bar #499298
SIMMER LAW GROUP PLLC
600 New Hampshire Ave, NW, Suite 10-A
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Albert B. Krachman, D.C. Bar #372776
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
Telephone: (202) 772-5800
Facsimile: (202) 772-5858
*Counsel for Relator*

98

## CERTIFICATE OF SERVICE

I hereby certify that on or around July 2, 2015, I caused a true and correct copy of Plaintiff's

Second Amended Complaint to be served on each of the parties listed below via certified, first-class

mail, postage prepaid.

W. Scott Simmer, D.C. Bar #460726
SIMMER LAW GROUP PLLC
600 New Hampshire Ave, NW, Suite 10-A
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

Service List

Loretta Lynch, U.S. Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Room B – 103
Washington DC 20530

Doris Coles-Huff
Deputy Chief Civil Division
United States Attorney's Office
District of Columbia
555 4th Street, NW
Washington, DC 20530

Brian Hudak, Assistant U.S. Attorney
United States Attorney's Office
District of Columbia
555 4th Street, NW
Washington, DC 20530

Jonathan H. Gold, Trial Attorney
United States Department of Justice
601 D St. NW, Rm. 9024
Washington, DC 20579